**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **WICKFIRE, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 1:14-CV-34** |
| | § | |
| **TRIMAX MEDIA, LLC,** | § | |
| **LAURA WOODRUFF,** | § | |
| **WREI, INC., JOSH WEST,** | § | |
| | § | |
| | § | **JURY DEMAND** |
| **Defendants.** | § | |

**PLAINTIFF WICKFIRE, LLC'S
FOURTH AMENDED COMPLAINT**

Plaintiff WickFire, LLC ("WickFire") files this Fourth Amended Complaint against TriMax Media LLC, ("TriMax"), Laura Woodruff ("Woodruff"), WREI, Inc. ("WREI"), and Josh West ("West") (collectively, "Defendants") and shows the following:

**NATURE OF THE ACTION**

1.      This action results from Defendants' combined pattern of unlawful activity directed at WickFire. WickFire and TriMax are competitors in the internet marketing and advertising business. Woodruff is the CEO of TriMax. West is, or has been, an employee of TriMax, and, upon information and belief, is Woodruff's relative. WREI is owned by West, and WREI and West perpetrated the unlawful conduct complained of in coordination with TriMax and Woodruff.

2.      Beginning at least as early as November 2012, Defendants initiated and sustained an aggressive and systematic scheme of unlawful activity at WickFire—namely, directing inordinately expensive and invalid "clicks" on WickFire's internet advertisements; creating and

placing fake WickFire advertisements that violated merchants' and affiliate networks' conditions, terms, and policies; and unlawfully copying genuine WickFire advertisements and placing them without WickFire's unique tracking identifier to deprive WickFire of revenues it would have otherwise earned.  Defendants' misconduct continued at least through mid-2014.

3.      Formed in 2011, at the time Defendants initiated their misconduct, Plaintiff WickFire was a relatively new and quickly growing entrant in the internet marketing and advertising space where Defendant TriMax and WickFire compete.  Defendants' misconduct began hours after WickFire won the merchant Freshology's business from Defendant TriMax. Defendants first attacked that relationship with fraudulent clicks on WickFire's Freshology advertisements. Defendants' fraudulent clicks depleted WickFire's advertising budget and harmed WickFire's ability to serve Freshology.  Defendants must have hoped that interfering with WickFire's Freshology relationship would allow them to win back Freshology's business.

4.      Defendants' Freshology attacks were only the beginning.  Defendants widened their click fraud campaign to affect hundreds of WickFire merchant customers.  Defendants' unlawful tactics evolved to include placing and falsely attributing to WickFire hundreds of fake advertisements that violated WickFire's customers' and affiliate networks' contract terms in an effort to cause WickFire to lose business.  These tactics posed a serious threat to WickFire's business because customer relationships in the business space where Plaintiff WickFire and Defendant TriMax operate are often coordinated and managed through a limited number of affiliate networks that facilitate and police customer relationships based on adherence to a given network's terms and conditions.  By attempting to get WickFire kicked out of affiliate networks, Defendants sought to eliminate a quickly-growing competitor to Defendant TriMax whose services were being preferred over Defendant TriMax's.

5.     Defendants' responsibility is incontrovertible.  Third parties such as Google, Inc. ("Google") and Verizon Communications, Inc. ("Verizon") have produced the technical equivalent of DNA evidence proving that Defendants committed the acts described herein.

6.     In whole, Defendants' deliberate misconduct caused WickFire millions of dollars in damage from fraudulent advertising costs and lost revenues as well as irreparable harm to WickFire's reputation.

7.     WickFire's pre-suit investigation showed that Defendant TriMax is responsible for the above misconduct and resulting harm, and based on evidence acquired during the pendency of the suit from Google, it became evident that Defendants Woodruff, WREI, and West have acted tortiously and in concert with Defendant TriMax and each other in committing the acts that underlie the causes of action that WickFire asserts in this action.

8.     Woodruff, WREI, Inc., and West are or were related to or affiliated with TriMax; act or have acted as TriMax's agent, servant, contractor, employee, or subsidiary; act or have acted according to TriMax's direction or control; and/or act or have acted within the course and scope of TriMax's agency, service, employment, or direction.  Woodruff, WREI, Inc., and West and TriMax are therefore jointly, severally, and concurrently liable and responsible for the causes of action set forth below.

9.     Further, and to the extent Woodruff or West now purports to have acted solely on behalf of TriMax and/or WREI in a representative capacity as officers of either company, Woodruff and West's conduct was intentionally tortious, and committed with malicious and/or fraudulent intent and thus undertaken in more than a purely associational capacity. Although the fiduciary-shield defense protects against liability for officers acting merely in their representative capacity, corporate agents may be held individually liable for fraudulent or tortious conduct

committed while in the service of their corporation and for their own benefit.

10.     Because of the immediate and irreparable harm caused by Defendants' wrongful conduct, WickFire seeks injunctive relief and damages for Defendants' illegal and unauthorized acts.

## PARTIES

11.     Plaintiff WickFire is a Texas limited liability corporation having its principal place of business located at 2028 E. Ben White Blvd., Suite 240-73367, Austin, TX 78741.

12.     On information and belief, TriMax is a Texas limited liability company, which according to filings with the Texas Secretary of State is the converted entity of TriMax Media, Inc., with its principal place of business located at 100 Crescent Ct., 7th floor, Dallas Texas 76201. On information and belief, TriMax's registered agent is Northwest Registered Agent, LLC, 700 Lavaca Street, Suite 1401, Austin, TX 78701 USA.

13.     Defendant Laura Woodruff is an individual residing in the state of Texas who, by agreement, may be contacted through her counsel of record, Mr. Peter Vogel, Esq.  Laura Woodruff is the Chief Executive Officer of TriMax.

14.     On information and belief, Defendant WREI, Inc. is a Texas corporation with its principal place of business at 7501 Red Springs Avenue, Lubbock, Texas 79423.

15.     Defendant Josh West is an individual residing in the state of Texas who, on information and belief, resides at either 5202 41st St., Lubbock, Texas 79414 or 7501 Red Springs Avenue, Lubbock, Texas 79423.  Josh West is TriMax's Director of Business Development.  Josh West is also identified as the only disclosed WREI Director on WREI's Certificate of Formation. Josh West is also identified as WREI's Agent for Service of Process.

16.     Upon information and belief, Josh West is related to Laura Woodruff.

**JURISDICTION AND VENUE**

17.     This is a complaint for causes of action under the Lanham Act, 15 U.S.C. §§ 1114, *et seq*. and the common law of Texas.  This Court has original subject matter jurisdiction over this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338 and 1367.

18.     On information and belief, venue is proper in the Western District of Texas under 28 U.S.C. §1391(b) and (c) because a substantial part of the events or omissions giving rise to the claims occurred here in this District, Defendants are continuously and purposefully doing business in this District, and Defendants have promoted goods and services that attempt to deceive the public into believing WickFire is the source of those goods and services in this District. Defendants' activities that support this District as the proper venue include, *inter alia,* actively soliciting and causing deceptive advertisements to be directed into this District, internet website advertising and promotion available in and directed to this District, and other use of the deceptive advertisements within this District.

**FACTS AND BACKGROUND**

I.     THE INTERNET ADVERTISING INDUSTRY

         A.     <u>The Players and the Technology</u>

19.     This case is about Defendants' misconduct within a specific form of internet advertising: internet search result advertising.  Internet advertising in general is a large and fast growing business.  According to the Internet Advertising Bureau, internet advertising revenues in the United States totaled $36.57 billion in 2012, up 15% from the previous year.  *See* IAB's Revenue Report for Fiscal Year 2012, *available at* http://www.iab.net/media/file/IAB_Internet_Advertising_Revenue_Report_FY_2012_rev.pdf. Internet search result advertising constituted $16.9 billion of total internet advertising revenue in 2012.

20.     With internet search result advertising, a merchant (also known in the industry as an "advertiser") can target an advertisement to an internet user's interests by placing the advertisement alongside the internet search results of an internet search performed by that user. This is accomplished by paying the internet search engine company (*e.g.*, Google) for the right to place the merchant's advertisement alongside search results for particular keywords or phrases. For example, an advertisement for a merchant who sells guided fly fishing tours in Wyoming can be placed alongside search results for an internet user who Googled the terms "Wyoming fishing." In most cases, the advertisement facilitates purchases from the merchant by linking directly to the merchant's website—in other words, clicking on the advertisement will take the internet user directly to the merchant's website. In other cases, the advertisement facilitates purchases from the merchant by linking to an approved third-party website—for example, a coupon website featuring coupons for use with that merchant.

21.     Instead of managing the intricacies of internet search result advertising in-house, many merchants rely on third parties to perform that role, which is where Plaintiff WickFire comes in. Formed in 2011 and headquartered in Austin, Texas, WickFire is a leading internet search result advertising company. In industry parlance, WickFire is a "publisher," because WickFire designs and implements merchants' internet search result advertising campaigns and strategy. Among other things, WickFire's responsibilities include identifying and bidding on the search query keywords, selecting the advertisement content, and selecting the geographies where the advertisements will be displayed. Accordingly, the advertisements that WickFire publishes combined with the strategy underlying how and where it publishes those advertisements is WickFire's product. The merchants for whom WickFire publishes advertisements are WickFire's customers.

22.     Google, Inc. is an example of an internet search result advertising services company.  As alluded to above, Google operates an internet search engine at its website www.google.com.  Internet users use the Google search engine to search the internet by running searches on key terms—for example, the phrase "Wyoming fishing" from above.  As the owner of a search engine, Google is positioned to charge for the ability to place advertisements next to search results for searches performed by users of Google's search engine.  Google manages this aspect of its business—selling search result advertising rights to search terms—with a service called Google AdWords.  Google AdWords is the platform by which an advertiser (whether directly or through a publisher like WickFire) buys rights to keywords, deploys advertisements in connection with Google search results, tracks the performance of advertisements, and monitors internet user activity with respect to that advertiser's advertisements.  As discussed further below, Google AdWords creates a highly detailed third-party electronic trail of evidence.

23.     Google AdWords pricing works on what is known as a cost-per-click (CPC) basis.  Specifically, an advertiser will pay Google a certain amount—for example, $1.00—every time an internet user clicks on an advertisement connected to the advertiser's keyword(s).  That $1.00 is the cost-per-click (or CPC) that advertiser pays for the right to have its advertisement appear next to search results produced by the advertiser's keyword(s).  Taking the "Wyoming fishing" example, if the CPC for "Wyoming fishing" is $1.00, the advertiser will pay Google $1.00 every time an internet user clicks on an advertisement from that advertiser tied to the keywords "Wyoming fishing."

24.     Under Google AdWords, Google establishes a minimum CPC price and in the case of competing advertisers sets the CPC price by auction.  An advertiser creates an advertisement, sets an overall budget for how much it will spend, and "bids" on keywords by specifying a

maximum amount of cost-per-click ("CPC").  Taking the "Wyoming fishing" example, assume the advertiser sets its budget to $10,000 at a maximum $5.00 CPC and that Google's minimum CPC is $1.00.  If there are no competing bidders, the "Wyoming fishing" advertiser will be able to place its advertisement for Google's minimum CPC, $1.00.  Assuming another party does not bid up the CPC during the campaign, the "Wyoming fishing" advertiser's $10,000 budget at $1.00 CPC will allow internet users to click on the advertisement 10,000 times (*i.e.*, $10,000 budget / $1.00 CPC = 10,000 clicks).

25.     Had the "Wyoming fishing" advertiser been competing with another advertiser with a similar quality advertisement, the advertiser with the higher CPC bid would win.  For example, if the competing advertiser had a maximum CPC bid of $5.01—compared to the "Wyoming fishing" advertiser's $5.00 maximum CPC bid—the competing advertiser would win the auction. The "Wyoming fishing" advertiser would either be prevented from placing its advertisement in connection with the keywords "Wyoming fishing" or relegated to a less advantageous position in the display of the search results.   In other words, the "Wyoming fishing" advertiser would be crowded out.  As discussed further below, WickFire suffered this crowding out effect where Defendants wrongfully and tortiously bid on keywords for merchants for which WickFire had exclusive publishing rights at CPC amounts that caused WickFire to lose the auction and precluded WickFire from performing its publishing obligations.

26.     As a publisher, WickFire's goal is to generate merchant sales by leading internet users (*i.e.*, potential customers of the merchant) to the merchant's website.  In WickFire's case, the advertisements serve that goal by linking to either the merchant's website or to WickFire's coupon website, [www.TheCoupon.co](www.TheCoupon.co), which provides digital coupons for use with the merchant.

27.     The distinction between publisher and merchant is important to understanding

WickFire's business model.  When a merchant uses a publisher like WickFire to handle the merchant's internet search result advertising, the publisher (*e.g.*, WickFire) alone pays the CPC cost.  The merchant's only financial obligation is to pay a commission to the publisher when an internet user's click on the merchant's advertisement results in a sale by that merchant.  In other words, the merchant incentivizes publishers like WickFire to assume the entire CPC cost by promising a share of the merchant sales, if any, that result from any advertisements published by that publisher. For example, if WickFire as publisher runs the $10,000 "Wyoming fishing" campaign discussed above on behalf of the "Wyoming fishing" merchant at a CPC of $1.00, WickFire is committing to paying $10,000 in CPC costs in the hope that those 10,000 clicks will generate enough merchant sales such that the resulting commission revenue to WickFire sufficiently exceeds WickFire's CPC cost.

28.     To get credit for merchant sales, a publisher is identified by a unique tracking identifier assigned to the publisher.   The unique tracking identifier is embedded in the advertisement and is not only readable by computers but is visible to any internet user who right clicks on the advertisement.  When a merchant sale occurs through an advertisement run by a publisher like WickFire or TriMax, the merchant uses the unique tracking identifier to determine the identity of the publisher it owes a commission.

29.     The usefulness of unique tracking identifiers is not limited to managing payment obligations.  They also enable a merchant to monitor and enforce publishers' compliance with the terms of the merchant's advertising contract.  A publisher advertising on behalf of a merchant enters into a contractual relationship with that merchant that is governed by certain terms and conditions.  Among other things, these terms and conditions address what keywords the publisher can bid on, whether or how the publisher can use the merchant's trademarks in the advertisement,

to what website(s) the advertisement can be linked, and whether or how the publisher can use the publisher's trademarks in the advertisement.  Some merchants monitor compliance on their own, and others use third-party service providers such as BrandVerity to monitor for violations.  Either way, the unique tracking identifier is how the publisher is identified.  Additionally, a merchant or third-party service can identify a publisher by the website linked to the advertisement (*i.e.*, the website to which the internet user would be taken by clicking on the advertisement) when that website is owned by the publisher (*e.g.*, WickFire's TheCoupon.Co website).

30.    Finally, a publisher's relationship to a merchant can be either direct, as described above, or indirect through what are known as affiliate networks.  Affiliate networks are comprised of merchant members and publisher members (also known as affiliates). The affiliate network aggregates merchant advertising offers for publishing by the affiliate network's publisher members (*e.g.*, WickFire, TriMax).   Affiliate networks facilitate the creation of business relationships between publishers and merchants by providing a dedicated forum for creating and reducing the overhead of merchant-publisher contractual relationships.   Affiliate networks may penalize publishers for violating merchant policies and conditions, with such penalties including removing a publisher (*i.e.*, affiliate) from the affiliate network and forfeiting commissions that are owed to the publisher.   In addition, affiliate networks maintain ratings provided by contract compliance services such as BrandVerity, a resource for merchants in deciding whether to do business with a particular publisher.

### B.    Anatomy of an Advertisement

31.    Much of Defendants' misconduct involved modifying and/or copying WickFire's merchant advertisements.  Before getting into the specifics of Defendants' misconduct, it is helpful to review the basic make-up of an advertisement for placement on Google, for example.

32.    An advertisement for display within Google follows a particular format.  The

format consists mainly of four fields: headline, description, display URL, and destination URL (the "Text Ad Data").  "URL" stands for "Uniform Resource Locator" and is known colloquially as a website address.  When the publisher creates an advertisement for display within Google, the publisher supplies the Text Ad Data to Google using the publisher's Google AdWords account. Below is the WickFire Freshology advertisement that was the first target of Defendants' misconduct:



33.     Analyzing the Text Ad Data for this advertisement, the headline, description and display URL are each visible and marked below.  The destination URL is not visible; instead, it is hyperlinked to the first line containing the headline.  In other words, by clicking on the first line containing the headline, a webpage is opened at the location of the destination URL.



34.     If an internet user were to right click on the advertisement, it would reveal, among other things, the unique tracking link identifying the publisher that published the advertisement.

II.     **INTENTIONALLY WRONGFUL CONDUCT DIRECTED AT WICKFIRE**

A.     **Defendants' Culpability**

35.     Beginning November 2012 at the latest, Defendants committed an array of deliberate, wrongful acts against WickFire with the intent of harming WickFire and WickFire's contractual and prospective contractual relationships with merchants, affiliate networks, and advertising service providers like Google.  Defendants' wrongful conduct consisted of click fraud, the misappropriation of genuine WickFire advertisements by Defendants to divert commission revenues from WickFire, and the creation of fake advertisements that Defendants falsely attributed to WickFire and that violated WickFire's contractual obligations to merchants.

36.     Over time and based on at least the following, WickFire concluded that at least Defendant TriMax was responsible for this misconduct:

- The initial misconduct targeted a WickFire merchant advertisement, Freshology, within 24 hours of Defendant TriMax being instructed to discontinue its advertising for Freshology.  At the time, WickFire and Defendant TriMax were the only search result advertisers permitted to publish on behalf of Freshology;

- Google data showed that the misconduct emanated almost exclusively from the Dallas, Texas area—the headquarters of Defendant TriMax; and,

- Publicly available records showed that some of the activity affecting WickFire's advertisements originated from an IP Address owned by Defendant TriMax (12.177.112.66).

37.     After more than a year of attempting to cope with Defendants' misconduct and even reaching out to Defendant Woodruff as CEO of Defendant TriMax, WickFire sent a cease and desist letter to Defendant TriMax on December 12, 2013.  Defendant TriMax did not respond, and WickFire filed this lawsuit on January 13, 2014.

38.     Following institution of the present lawsuit, WickFire continued its investigation into the party responsible for all of the above described acts against WickFire, including through

third-party discovery efforts directed to internet service providers such as Verizon, and internet search result advertising service providers and their products/services, such as Google and its AdWords product/service.

39.     Using its own click logs and the information available to it through its Google AdWords account, WickFire identified instances of misconduct to Verizon and Google by information that enabled Verizon and Google to identify the parties responsible for the misconduct.

40.     With Verizon, WickFire identified instances of click fraud by date, time, and IP Address.  (*See* **Exhibit A** hereto, the click fraud instances supplied to Verizon for identification of the Verizon accountholder responsible for that activity.)   Because WickFire published the advertisements at issue, WickFire can see the date, time, and IP address of each click on its advertisements.

41.     "IP address" stands for "internet protocol address," and is the unique address given to a device connected to the internet in order for it to be able to send and receive data over the internet, *i.e.* the device's "address" over the internet.  An IP address can consist of a four set series of one to four numbers, each separated by a period, for example, 192.168.0.1, ("IP4") or a series of several sets of numbers or letters, each set separated by a colon, for example, FE80:0000:0000:0000:0202:B3FF:FE1E:8329 ("IP6"). There are two general types of IP address, static and dynamic.

42.     A static IP address is assigned to a single accountholder at a single location.  For example, an individual may have a home internet connection provided by AT&T (in this example, AT&T, and any company that provides internet service, is known as an "ISP," or "internet service provider").  For as long as the individual is an accountholder, AT&T assigns that individual a unique IP address for that location.  As a result, any internet activity from that unique IP address

necessarily identifies that individual's home as the location of that internet activity.

43.     A dynamic IP address, by contrast, is not fixed to a single accountholder or location. Dynamic IP addresses come into play, for example, when an individual accesses the internet from a mobile phone over the 3G network.  When an individual is walking around downtown Austin and accesses the internet from a Blackberry or iPhone, that individual's cell phone service provider functions as an ISP and assigns the individual a unique IP address for only the duration of that particular internet session.  If the individual shuts off the phone or switches the phone into airplane mode, the IP address is lost and another will be assigned the next time the individual uses the phone to access the internet.  With all of that said, the important point is that even a dynamic IP address can be used to identify the account that accessed the internet, and possibly the location of access, when one knows the date, time, and IP address in question.

44.     Ultimately, in response to WickFire's subpoena supplying the information necessary to identify the Verizon accountholder responsible for the click fraud WickFire suffered, Verizon produced the document attached hereto as **Exhibit B**, which shows Defendant TriMax as the accountholder responsible for the fraudulent clicks.

45.      As definitive as the Verizon evidence is, it took WickFire's subpoena to Google to discover that Defendant TriMax did not act alone and the disturbing lengths to which Defendants went to harm WickFire, including impersonating WickFire's CTO, the sister of WickFire's CEO, and at least two other individuals by creating fraudulent Google AdWords accounts in their names.

46.     As discussed above, Google AdWords is the Google service that allows advertisers (either publishers like WickFire and TriMax or a merchant) to run advertisements on Google. Having a Google AdWords account is necessary for running advertisements on Google, and all advertisement-related activity is conducted through the Google AdWords account. The Google

AdWords account includes records of all advertisement-related account activity, including bid activity, advertisement placement activity (*e.g.*, geographic location, content), and the IP address from which each instance of account activity originated.  Knowing this, WickFire subpoenaed Google to determine what Google AdWords accounts, including the identity of the accountholder, were responsible for the fake advertisements.

47.     Specifically, WickFire requested that Google identify and produce records of advertisement-related activity for the Google AdWords accounts responsible for placing the advertisements identified on **Exhibit C**, attached hereto.  The advertisements listed on Exhibit C are 17 examples of fake advertisements falsely designated as WickFire advertisements which led to WickFire receiving scores of contract violation notices from WickFire's customer merchants and an array of resulting harm.  Some of the advertisements identify WickFire by incorporating WickFire's unique tracking identifier; others identify WickFire by incorporating WickFire's TheCoupon.Co mark and/or linking to WickFire's TheCoupon.co website.  None of the advertisements was placed by WickFire or with WickFire's permission, and all of them constituted violations of contractual obligations owed under merchants' advertising terms and conditions.

48.     Google's production in response to WickFire's subpoena shows that the 17 advertisements were placed by 8 Google AdWords accounts.  Three of the eight AdWords accounts are held in the names of and/or are paid for by Defendants (collectively, "Defendants' Genuine AdWords Accounts").  Based on the commonality of IP addresses shown in the account activity of Defendants' Genuine AdWords Accounts, the other five accounts are related to and were created by Defendants in false names (collectively "Defendants' False AdWords Accounts").  One of Defendants' False AdWords Accounts is in the name of the sister of WickFire CEO.  Two of Defendants' False AdWords Accounts are in the name of WickFire CTO.  The last two of

Defendants' False AdWords Accounts are in the names of two third-party individuals who own companies involved in the internet search result advertising business.

49.     The account activity records for Defendants' Genuine AdWords Accounts shows a number of IP addresses that are used across all three of Defendants' Genuine AdWords Accounts. Those same IP addresses also appear in the account activity records for Defendants' False AdWords Accounts. The commonality of IP addresses between Defendants' Genuine AdWords Accounts and Defendants' False AdWords Accounts shows that Defendants were responsible for all 17 of the false advertisements submitted to Google with WickFire's subpoena.

50.     The commonality of IP addresses also shows that Defendants are responsible for all account activity that occurred within each of the 8 Google AdWords accounts identified by Google's production in response to WickFire's subpoena (*i.e.*, each of Defendants' Genuine AdWords Accounts and each of Defendants' False AdWords Accounts). The 17 advertisements submitted to Google were examples of Defendants' misconduct. Google's production shows that Defendants' misconduct went far beyond those 17 examples and occurred at a furious pace from at least late 2012 to at least early 2014.

51.     Taken together, the Verizon and Google productions constitute incontrovertible proof of Defendants' culpability for the full scope of misconduct suffered by WickFire. The Verizon data shows Defendants engaging in click fraud by the minute. The Google data shows Defendants both copying WickFire's genuine advertisements and removing the WickFire unique tracking identifier and creating fake advertisements that displace WickFire's advertisements and link directly to the merchant. The Google data shows Defendants creating fake advertisements that violate merchant terms and conditions and then falsely designating them as WickFire advertisements by including WickFire's unique tracking identifier. The Google data shows

Defendants creating fake advertisements that violate merchant terms and conditions and then falsely designating them as WickFire advertisements by including WickFire's TheCoupon.co mark and/or linking the fake advertisement to WickFire's TheCoupon.co website.  The Google data shows Defendants creating fake advertisements that violate merchant terms and conditions and then falsely designating them as WickFire advertisements before linking them to a webpage promoting an adult toy store.  This third-party proof is as unassailable as it is expansive and detailed.

    **B.**  **Click Fraud Increasing the Cost of WickFire's Business and Depriving WickFire of Commission Revenue**

    **(i)**  **Overview**

   52. As discussed in greater detail above, WickFire's cost of publishing advertisements is expressed on a cost-per-click ("CPC") basis.  The CPC is established by auction, and whoever wins the auctions pays the CPC every time an internet user clicks on that publisher's advertisement until the publisher's campaign budget is exhausted.

   53. Defendants' click fraud against WickFire involved clicks by Defendants on WickFire's genuine advertisements meant to exhaust WickFire's campaign budget and deprive WickFire of legitimate user clicks that would have generated commission revenue to WickFire from resulting merchant sales.

    **(ii)**  **Defendants' Freshology Click Fraud**

   54. Freshology is a merchant that uses publishers like WickFire to manage internet search result advertising campaigns on its behalf.  On or around August 7, 2012, Freshology contracted WickFire to provide Freshology with internet search result advertising campaigns. Although WickFire was told upon being hired that WickFire would eventually become the

exclusive publisher for Freshology, at the beginning of the relationship and through the end of October 2012, both WickFire and Defendant TriMax were authorized to run internet search result advertising campaigns on Freshology's behalf.  Importantly, from August 7, 2012 through the end of October 2012, WickFire and Defendant TriMax were the ***only*** publishers Freshology authorized to run its campaigns.

55.     Freshology's business relationship with WickFire and Defendant TriMax was managed through an outsourced program management company called FiveCentShine—that is, Freshology hired FiveCentShine to act as Freshology's agent in managing publishers of Freshology's internet search result advertising campaigns.

56.     On October 31, 2012, Freshology, through its agent FiveCentShine, sent Defendant TriMax (specifically, Defendant Woodruff) an email instructing Defendant TriMax to stop all work for Freshology.  At that point, WickFire became Freshology's exclusive publisher.  The next morning Defendants began targeting WickFire with click fraud.

57.     On November 1, 2012, WickFire began experiencing click fraud directed at its Freshology campaign.  Below is a screenshot of the WickFire Freshology advertisement targeted with click fraud:



58.    From 10:18am Central until 10:54am Central on November 1, 2012, WickFire

experienced the following systematic flurry of clicks on its Freshology advertisement:

| Click Time | Referring Query | Click IP Address |
|---|---|---|
| 11/1/2012 10:18 | freshology diet | 75.230.94.202 |
| 11/1/2012 10:18 | www.freshology.com | 75.230.94.202 |
| 11/1/2012 10:18 | freshology.com | 75.230.94.202 |
| 11/1/2012 10:18 | freshology | 75.230.94.202 |
| 11/1/2012 10:21 | www.freshology.com | 75.222.1.252 |
| 11/1/2012 10:21 | freshology.com | 75.222.1.252 |
| 11/1/2012 10:21 | freshology diet | 75.222.1.252 |
| 11/1/2012 10:21 | freshology | 75.222.1.252 |
| 11/1/2012 10:24 | freshology diet | 75.227.129.207 |
| 11/1/2012 10:24 | www.freshology.com | 75.227.129.207 |
| 11/1/2012 10:24 | freshology.com | 75.227.129.207 |
| 11/1/2012 10:24 | freshology | 75.227.129.207 |
| 11/1/2012 10:26 | freshology | 75.227.190.137 |
| 11/1/2012 10:26 | freshology diet | 75.227.190.137 |
| 11/1/2012 10:26 | freshology.com | 75.227.190.137 |
| 11/1/2012 10:26 | www.freshology.com | 75.227.190.137 |
| 11/1/2012 10:28 | www.freshology.com | 75.230.104.197 |
| 11/1/2012 10:28 | freshology.com | 75.230.104.197 |
| 11/1/2012 10:28 | freshology diet | 75.230.104.197 |
| 11/1/2012 10:28 | freshology | 75.230.104.197 |
| 11/1/2012 10:29 | www.freshology.com | 75.222.19.85 |

| 11/1/2012 10:29 | freshology.com | 75.222.19.85 |
|---|---|---|
| 11/1/2012 10:29 | freshology diet | 75.222.19.85 |
| 11/1/2012 10:30 | freshology | 75.222.19.85 |
| 11/1/2012 10:32 | www.freshology.com | 75.222.74.106 |
| 11/1/2012 10:32 | freshology diet | 75.222.74.106 |
| 11/1/2012 10:32 | freshology.com | 75.222.74.106 |
| 11/1/2012 10:32 | freshology | 75.222.74.106 |
| 11/1/2012 10:34 | www.freshology.com | 75.254.41.207 |
| 11/1/2012 10:34 | freshology diet | 75.254.41.207 |
| 11/1/2012 10:34 | freshology.com | 75.254.41.207 |
| 11/1/2012 10:34 | freshology | 75.254.41.207 |
| 11/1/2012 10:35 | freshology | 75.230.255.227 |
| 11/1/2012 10:35 | freshology.com | 75.230.255.227 |
| 11/1/2012 10:35 | freshology diet | 75.230.255.227 |
| 11/1/2012 10:35 | www.freshology.com | 75.230.255.227 |
| 11/1/2012 10:38 | freshology | 75.230.154.68 |
| 11/1/2012 10:38 | freshology.com | 75.230.154.68 |
| 11/1/2012 10:38 | www.freshology.com | 75.230.154.68 |
| 11/1/2012 10:38 | freshology diet | 75.230.154.68 |
| 11/1/2012 10:39 | www.freshology.com | 75.227.151.0 |
| 11/1/2012 10:40 | freshology | 75.227.151.0 |
| 11/1/2012 10:40 | freshology diet | 75.227.151.0 |
| 11/1/2012 10:40 | freshology.com | 75.227.151.0 |
| 11/1/2012 10:42 | freshology diet | 75.230.22.202 |
| 11/1/2012 10:42 | www.freshology.com | 75.230.22.202 |
| 11/1/2012 10:42 | freshology.com | 75.230.22.202 |
| 11/1/2012 10:42 | freshology | 75.230.22.202 |
| 11/1/2012 10:46 | freshology.com | 75.227.197.26 |
| 11/1/2012 10:46 | freshology | 75.227.197.26 |
| 11/1/2012 10:47 | freshology diet | 75.227.197.26 |
| 11/1/2012 10:47 | www.freshology.com | 75.227.197.26 |
| 11/1/2012 10:49 | freshology diet | 75.227.130.238 |
| 11/1/2012 10:49 | www.freshology.com | 75.227.130.238 |
| 11/1/2012 10:49 | freshology.com | 75.227.130.238 |
| 11/1/2012 10:49 | freshology | 75.227.130.238 |
| 11/1/2012 10:51 | freshology diet | 75.230.140.95 |
| 11/1/2012 10:51 | www.freshology.com | 75.230.140.95 |
| 11/1/2012 10:51 | freshology.com | 75.230.140.95 |
| 11/1/2012 10:51 | freshology | 75.230.140.95 |

| 11/1/2012 10:53 | freshology | 75.230.170.1 |
|---|---|---|
| 11/1/2012 10:53 | freshology.com | 75.230.170.1 |
| 11/1/2012 10:54 | www.freshology.com | 75.230.170.1 |
| 11/1/2012 10:54 | freshology diet | 75.230.170.1 |

59.     These clicks were highly suspicious to WickFire for a number of reasons.

60.     First, the sheer volume of clicks within such a limited time window was unusual.

61.     Second, the clicks were made systematically in a repeating pattern.  As the above data shows, over and over again, a single IP Address used the same four keywords (*i.e.*, "freshology diet," "www.freshology.com," "freshology.com," and "freshology") as search terms to pull up WickFire's Freshology advertisement and click on it.  For example, from 10:18:14 Central to 10:18:26 Central, a user at IP Address 75.230.94.202 brought up WickFire's Freshology advertisement four times in a row and clicked on it four times in a row using the search terms "freshology diet," "www.freshology.com," "freshology.com," and "freshology."  Three minutes later, from 10:21:36 Central to 10:21:42 Central, a user at IP Address 75.222.1.252 repeated the exact same search and click pattern on WickFire's Freshology advertisement.  Two-and-a-half minutes later, a user at IP Address 75.227.129.207 repeated the exact same pattern.  For the next thirty minutes, the same pattern repeated itself thirteen more times.

62.     Third, as discussed above, Defendants' fraudulent clicks occurred within hours of Defendant TriMax being instructed not to publish any more advertisements for Freshology.

63.     At the same time Defendants were clicking on WickFire's Freshology advertisements to exhaust WickFire's CPC budget, Defendants were also increasing the CPC price by bidding on Freshology-related keywords despite having had their authorization revoked by Freshology.  Such bidding by Defendants magnified the harm caused by their click fraud and serves as additional evidence of Defendants' intent behind and responsibility for their fraudulent

clicks on WickFire's advertisements.  The following are a few examples of the exorbitant CPC prices that Defendants imposed on the keywords for WickFire's Freshology campaign:

- On November 13, 2012, the average CPC for the keyword "freshology.com" was $139.68.

- On December 3, 2012, the average CPC for the keyword "www.freshology.com" was $159.86.

- On December 5, 2012, the average CPC for the keyword "www.freshology.com" was $165.44.

- On December 17, 2012, the average CPC for the key word "freshology.com" was $142.49.

64.     As WickFire would learn, Defendants did not limit such bid activity to WickFire's Freshology advertisements.  Defendants used such CPC bidding in conjunction with additional advertisements to intensify the effect of their click fraud with the same intention of causing high CPC spend that would deplete WickFire's budget.

65.     Ultimately, the click fraud that began with Defendant TriMax being dropped from the Freshology account would continue through at least December 2013 and expand to encompass scores of WickFire advertisements and merchant and affiliate network relationships. When WickFire's advertisements were outbid or its budget exhausted, Defendants would often run similar advertisements in their place.  And, when WickFire's advertisement was placed, the same profile of inordinately expensive and invalid click-activity ensued: a large number of inordinately expensive and invalid clicks on a very narrow set of keywords, from the same internet protocol address ranges, and with consistent user agent information, geographic location, and click methodology.  The direct result was injury to WickFire, including but not limited to the cost of invalid clicks, loss of existing and prospective accounts, and harm to WickFire's business reputation.

66.     Over time, WickFire's initial suspicion that Defendant TriMax was the culprit

would be borne out by an array of additional evidence.  On November 8, 2013, a WickFire advertisement for Old Time Candy experienced click fraud by a user at IP Address 12.177.112.66. When WickFire investigated, publicly available records showed that Defendant TriMax owned IP Address 12.177.112.66 on November 8, 2013.  (*See* **Exhibit D** hereto.) When WickFire investigated the geographical source for the many click fraud attacks by analyzing data available in Google Analytics, Google data showed that the attacks originated from the Dallas, Texas area— Defendant TriMax's headquarters location.

67.    With this case underway, WickFire was able to confirm its pre-suit determination of Defendant TriMax's culpability through third-party documents that show incontrovertibly that Defendant TriMax and Defendants Woodruff, WREI, and West knowingly, intentionally, and maliciously committed numerous acts of click fraud against WickFire.

68.    As noted above, the first instance of click fraud that WickFire identified on November 1, 2012 was from 10:18:14 Central to 10:18:26 Central by a user at Verizon IP address 75.230.94.202.   Third-party documentation from Verizon identified the Verizon IP address responsible for those clicks as belonging to Defendant TriMax.  (*See* Ex. B at 4.)

69.    The Verizon production also proved that Defendants, using Verizon IP address 75.254.48.195, committed the click fraud that WickFire experienced on its November 8, 2013 PZI Jeans advertisement at 4:29 PM Central.  (*See* Ex. B at 6.)

70.     The Verizon production also proved that Defendants, using Verizon IP address 75.254.53.167, committed the click fraud that WickFire experienced on its November 21, 2013 Shortorder advertisement at 6:30 PM Central.  (*See* Ex. B at 6.)  During the eight minutes preceding Defendants' click fraud on WickFire's Shortorder advertisement, WickFire also experienced click fraud on advertisements for Ignatius Press, Hotel Planner, MyOwnLabels, American Healthcare

Academy (CPRAEDCourse.com), and IZI Dress.   WickFire's server logs show that the same Verizon IP address, 75.254.53.167, was responsible for those clicks.   Accordingly, Defendants committed these acts of click fraud as well.

71.     Ultimately, WickFire experienced click fraud on advertisements for at least the following merchants: Freshology; eFoodsDirect; Zinio; Limos.com; MyOwnLabels; CitySightsNY; NewYorkSightseeing.com/Gray Line New York; Hotel Planner; Apparel Showroom; Jigsaw Health; Old Time Candy; AllianceTickets.com; American Healthcare Academy (CPRAEDCourse.com); Highlifter.com; Total Homecare Supplies; 911 Health Shop; Ignatius Press; SaltwaterFish.com; Coolglow.com; TheStationeryStudio.com; Resume Companion; PCS Outdoors; NFIB; Knife Depot; PZIJeans.com; 1800AnyLens; Green Screen Wizard; Highlifter.com; Green Screen Wizard; BonsaiBoy.com;; Personalabs.com; PZIJeans.com; Good Morning Snore Solution; Technollo; Century MMA; NationalUnderwriter.com; East Coast Photo; ShortOrder.com; Sonos.com; Light in the Box; Dollar Shave Club; RockCreek.com; IziDress.com; Iolo.com; Lumens.com; GlassesUSA.com; Forex Mentor; Great Deal Furniture; AmericanBridal.com; ShoppersChoice.com; BBQGuys.com; BlindsExpress.com; Cameta.com; Deluxe.com; ClickInks.com; Costumes4Less.com; FrenchToast.com; Candy Galaxy; Direct Garden Décor (Garden-Fountains.com); HalloweenCostumes.com; Imemories.com; Inkfarm.com; InkjetSuperstore.com; iPage.com; Kelby Training; LensWorld.com; LuggageGuy.com; Medjet.com; MiniInTheBox.com; PoolProducts.com; Professional Supplement Center; ShoppersChoice.com; StylishPlus.com; TheShelvingStore.com; TNVitamins.com; WebVitamins.com; FreshTrends.com; Strapworks.com.  Upon information and belief, and based upon the incontrovertible third-party evidence subpoenaed from Verizon and Google, Defendants knowingly, intentionally, and

maliciously committed these acts of click fraud to attack WickFire by raising its CPC costs and/or exhausting its advertising campaign budgets. WickFire has produced server logs and other information to Defendants that detail these instances to the same degree as the exemplar instances of click fraud discussed above.

72. WickFire has learned during the course of this litigation that the click fraud it has suffered at the hands of Defendants follows a pattern of unlawful, anticompetitive conduct by at least Defendants TriMax and Woodruff. After learning of this litigation, a former employee of Defendant Woodruff and Defendant TriMax's wholly-owned subsidiary, 1st Quest Media, LLC, contacted WickFire to explain that Defendant Woodruff had taught the former employee and others how to commit click fraud against competing affiliates. The former employee explained to WickFire that Defendant Woodruff provided Verizon devices for the sole, express purpose of committing click fraud. The former employee's description of the click fraud techniques Defendant Woodruff taught matched what WickFire experienced.

73. Defendants' click fraud harmed WickFire by causing WickFire to spend its advertising campaign budgets more quickly and with lower commission revenue because so many of the clicks were Defendants' fraudulent clicks, not genuine merchant customers. Defendants' click fraud activity hindered WickFire in producing positive sales results for its merchant customers. In the case of Freshology, Defendants' click fraud activity interfered with WickFire's contractual relationship with Freshology by making WickFire's performance under the contract more burdensome, difficult, and expensive. In total, Defendants' click fraud caused WickFire to suffer at least $50,000 in fraudulent advertising spend and $500,000 in lost commissions. In addition, WickFire spent over 1,000 hours of time working to save its business in the face of Defendants' click fraud. The effect was to prevent WickFire from competing against Defendant

TriMax for over a year as such attempts at competition routinely resulted in massively inflated advertising costs to WickFire with no offsetting revenue.

### C.    Advertisement Misappropriation and Crowding Out of WickFire's Genuine Advertisements

74.    In addition to click fraud, Defendants misappropriated WickFire's genuine advertisements and began running them without WickFire's unique tracking identification information.   For example, on November 9, 2012, Defendants copied and ran a WickFire Freshology advertisement.

75.    By copying and publishing this misappropriated advertisement, Defendants prevented WickFire's genuine Freshology advertisement from appearing and deprived WickFire of commissions from sales that would have been generated WickFire's genuine Freshology advertisement.

76.    In addition to the particular Freshology example described above, upon information and belief, and based upon Defendants' advertising activities as reflected in the Google production, Defendants repeated this type of misconduct numerous times.

### D.    Fake, Noncompliant Advertisements Falsely Attributed to WickFire

77.    Starting in late November 2013, advertisements intended to frame WickFire for merchant contract violations began appearing on Google.   WickFire did not place these advertisements; Defendants did.

78.    As mentioned above, merchant internet search result advertising contracts often restrict the keywords and advertising content publishers like WickFire and TriMax can use in internet search result advertising. For example, a merchant may not allow bidding on any of their trademarks at any search engine. Another may not allow internet search result advertising at all. Merchants routinely monitor advertisements for violations of their terms.   Some merchants

monitor for violations using in-house capabilities, and some use affiliate networks or outside companies like BrandVerity to monitor on their behalf. When merchants identify a violation, they often reverse commissions paid to that publisher and/or bar that publisher from their advertising program.

79.     This issue first came to WickFire's attention on November 26, 2013, when WickFire received an email from the merchant Bloomex indicating that a WickFire advertisement was violating its keyword restrictions and that Bloomex had removed WickFire from its internet search result advertising program. WickFire had never placed any internet search advertisements pointing to Bloomex or utilizing the keywords referenced in the violation, and WickFire replied asking for more information. Bloomex's reply included a screenshot of an advertisement on Google for the keyword "bloomex" that linked to WickFire's TheCoupon.co website using the following text, "TheCoupon.Co/Bloomex." WickFire confirmed internally that it had not placed this advertisement and communicated that information to Bloomex.  Upon information and belief, Defendants are responsible for the fraudulent Bloomex advertisement.

80.     The same day—November 26, 2013—WickFire received two more emails alerting WickFire to merchant policy violations by apparent WickFire advertisements:  one from Medjet Assist, a merchant in the Commission Junction affiliate network, about an advertisement Medjet Assist found for the keyword "medjetassist" that linked to WickFire's TheCoupon.co website using the following text "TheCoupon.Co/MedjetAssist," and one from Murad, also a Commission Junction merchant, indicating that WickFire had been removed from Murad's program for violating Murad advertising terms by bidding on terms that included or constituted Murad trademarks.  WickFire did not place these advertisements.  Upon information and belief, Defendants are responsible for the fraudulent Medjet Assist and Murad advertisements.

81.     Alerted to the above fraudulent advertisements, WickFire searched Google Adwords in an effort to find the offending advertisements.  Eventually WickFire located the Bloomex, Medjet Assist, and Murad advertisements. Upon finding these fraudulent advertisements, WickFire was able to determine that the true source of these fraudulent advertisements had blocked them from displaying in Austin, Texas to make it more difficult for WickFire to find them.  Google AdWords allows publishers like WickFire and TriMax to designate specific geographic areas in which a particular advertisement will run. It also allows a publisher to affirmatively *exclude* a specific geographic area.  For each of the Bloomex, Medjet Assist, and Murad advertisements, their creator had explicitly instructed Google AdWords not to publish the advertisements in Austin by including the following: "Austin, Texas (EXCLUDE)."  The affirmative exclusion of these advertisements from the Austin, Texas area meant that no one accessing the internet from the Austin, Texas area would see these advertisements—that is, WickFire, being based in Austin, could not see these fraudulent advertisements. Over time, as it became aware of the vastness of Defendants' fraudulent advertisement campaign, WickFire would learn that the affirmative exclusion of the Austin, Texas area was a signature of the parties responsible for placing these fraudulent advertisements and others.

82.     Beginning November 2013, WickFire discovered or became aware of hundreds of fraudulent advertisements that falsely identified WickFire as a violator of merchant advertising terms and conditions.  These fraudulent advertisements falsely identified WickFire as their source in one of two ways: (i) by misappropriating and linking to WickFire's TheCoupon.Co website and/or including WickFire's TheCoupon.co mark in the advertisement's content, and (ii) by misappropriating and inserting WickFire's unique identifier tracking links.

**(i)      TheCoupon.Co-linked Fake Advertisements**

83.      As exemplified by the Bloomex and Medjet Assist fraudulent advertisements described above, some of the fraudulent advertisements linked to WickFire's TheCoupon.Co web property. As noted above with the Bloomex and Medjet Assist examples, such advertisements included WickFire's THECOUPON.CO mark in the display URL and as part of the destination URL information displayed when, for example, a user right clicks on the advertisement. Additionally, any user clicking on the fraudulent advertisement would arrive at WickFire's TheCoupon.Co website.

84.      Another example involves merchant BrownShoe.  WickFire received a December 17, 2013 Notice from BrownShoe, attached hereto as **Exhibit E**, advising WickFire that BrownShoe had identified a December 16, 2013 WickFire advertisement that violated BrownShoe's advertising terms and condition.  The BrownShoe Notice included the Text Ad Data of the offending advertisement and showed that the offending advertisement included WickFire's mark THECOUPON.CO in the description and referenced WickFire's TheCoupon.Co website in the display URL and destination URL.

85.      WickFire neither created nor published the offending BrownShoe advertisement. The Google production shows that Defendants did.  As discussed above, Google produced account activity records for eight Google AdWords accounts controlled and used by Defendants—3 of which are Defendants' Genuine AdWords Accounts and 5 of which are Defendants' False AdWords Accounts.  One of Defendants' False AdWords Accounts—the one that impersonates the sister of WickFire's CEO—shows the creation and placement of the BrownShoe advertisement referred to in BrownShoe's Notice to WickFire.

86.      Yet another example involves merchant GlassesUSA.  On January 16, 2014,

GlassesUSA notified WickFire of an apparent WickFire advertisement for GlassesUSA that violated its terms and conditions.  At the time, WickFire was acting as a publisher for GlassesUSA pursuant to GlassesUSA's standard internet search result advertising contract.  As a result of the offending GlassesUSA advertisement, GlassesUSA barred WickFire from continuing to publish on behalf of GlassesUSA.

87.     WickFire neither created nor published the offending GlassesUSA advertisement. Here again, Defendants used Defendants' False AdWords Accounts—the one that impersonates the sister of WickFire's CEO—to create and place the GlassesUSA advertisement complained of by GlassesUSA and that led to GlassesUSA discontinuing use of WickFire.

### (ii)      Merchant-linked Fake Advertisements

88.     Instead of identifying or linking to WickFire's TheCoupon.Co website, other fraudulent advertisements linked directly to a merchant's website.  These fraudulent advertisements falsely identified WickFire as their source by misappropriating and including WickFire's unique tracking identifier.

89.     WickFire became aware of one of these merchant-linked fraudulent advertisements when it received a December 3, 2013 Notice from merchant DownEast Basics, attached hereto as **Exhibit F**, stating that a December 3, 2103 WickFire advertisement violated DownEast Basic's advertising terms and conditions. The DownEast Basics Notice included the Text Ad Data of the offending advertisement and showed that WickFire was identified in the advertisement by the use of WickFire's unique tracking identifier in the destination URL.

90.     WickFire neither created nor published the offending DownEast Basics advertisement.  As with the BrownShoe advertisement discussed above, the Google production shows that Defendants created and placed the offending DownEast Basics advertisement.  The

Google production shows that Defendants used another of Defendants' False AdWords Accounts—one of the two that impersonates WickFire's CTO—to create the offending DownEast Basics advertisement.

91.     Moreover, each of the advertisements identified by the relevant Google links identified on Attachment C to WickFire's Subpoena to Google (*see* Ex. C hereto) is a fraudulent advertisement falsely attributed to WickFire and created and published by Defendants in and through either Defendants' Genuine AdWords Accounts or Defendants' False AdWords Accounts.

92.     Upon information and belief, Defendants control or own, or have controlled or owned, additional Google AdWords accounts through which Defendants published fraudulent advertisements, the identity of which Defendants are unlawfully concealing from discovery in this litigation in the same way Defendant TriMax attempted to conceal the existence of certain of Defendants' Genuine AdWords Accounts or Defendants' False AdWords Accounts by providing false interrogatory responses.

93.     In total, WickFire received violation notices from the following merchants complaining of, and blaming WickFire for, Defendants' fraudulent advertisements (relevant affiliate network identified parenthetically): Bloomex (ShareASale); MedJet (Commission Junction); Brownshoe / Naturalizer / LifeStride (Linkshare); JebCommerce / DownEastBasics (ShareASale); SwimsuitsForAll (ShareASale); Expedia.com (Commission Junction); HolaBirdSports (Commission Junction); Canvas on Demand (ShareASale); InTheHoleGolf (ShareASale); Gaiam (Commission Junction); InkGrabber.com (Commission Junction); CheapAir (Commission Junction); eCampus (ShareASale); BistroMD (Commission Junction); J2 / MyFax.com / Evoice.com (Commission Junction); LexMod.com (Commission Junction); OfficeDepot.com (Commission Junction); Tria Beauty (Commission Junction); GlassesUSA

(ImpactRadius); Scrubs & Beyond (Commission Junction); Moosejaw (Commission Junction); iPage (Commission Junction); Jewelry.com (Commission Junction); FatCow (Commission Junction); HSI Professional (Commission Junction); Discount School Supply (Commission Junction and PepperJam); Sheet Music Plus (Commission Junction and ShareASale & PepperJam).

94.    Alerted to Defendants' fraudulent advertisements, WickFire invested hundreds of hours in conducting its own investigation and discovered that Defendants' misconduct far exceeded what was apparent based on the violation notices alone.  In total, WickFire discovered fraudulent advertisements falsely attributed to WickFire for over 150 merchants:

| | | |
|---|---|---|
| 123inkjets | franklin mint | pacsun |
| 123print | french toast | plumbersurplus.com |
| 1and1.com | freshology | poolproducts.com |
| 2xist.com | glasses usa | republic wireless |
| 6dollarshirts | global rose | rock creek |
| a1supplements | go airlink NYC | sally beauty supply |
| abes of maine | godaddy | scoutmob |
| abesmarket | gold medal wine club | scrubsandbeyond.com |
| accentsinthegarden.com | heels.com | sheetmusicplus.com |
| american bridal | holabird sports | sheinside |
| amiclubwear | homerunmonkey | shoes.com |
| anthonyrobbins.com | honeyville grain | ShoppersChoice.com |
| arkivmusic.com | hsi professional | sit4life |
| b12patch.com | ixwebhosting | skechers.com |
| bachelorette.com | hudson reed | sleekhair |

| | | |
|---|---|---|
| batteries.com | imemories | smilebox |
| bbqguys.com | inkfarm | sonos |
| beachbody.com | inkgrabber | ssense |
| beautorium.com | inkjet superstore | straighttalk.com |
| bebe.com | inksoutlet | strawberrynet |
| belleandclive.com | intheholegolf.com | stylinonline |
| bigdiscountfragrances.com | iolo.com | stylish plus |
| bigdogs.com | ipage | summitsoft |
| bistromd.com | jigsaw health | superherostuff |
| blinds express | jimmy jazz | supplies outlet |
| bloomex | josabank | sure fit |
| cafebritt | just flowers | swimsuits for all |
| cafepress.com | kabloom | switch modern |
| cameta camera | knetbooks | system mechanic |
| canvasondemand | lensworld.com | tattoosales.com |
| cellphoneshop | lexmod | Taylor gifts |
| checks unlimited | life stride | tbdress |
| claires | lifeisgood.com | teavana |
| Clickinks | lifelock | the stationery studio |
| clubs of america | lifestride | tnvitamins |
| coffee for less | luggage guy | totally furniture |
| costumes4less | madame bridal | totally guitars |
| countryoutfitter.com | maggy london | triabeauty.com |
| CPO tools | mcafee | uberprints.com |
| crabtree & evelyn | mcm electronics | Uboxes |

| | | |
|---|---|---|
| dealchicken | meditests | verizonwireless.com |
| discount school supply | medjet.com | verseo |
| dollar shave club | MiniInTheBox.com | vet shop online |
| dr. scholls | modnique | walgreens |
| eastessence.com | moosejaw | walking company |
| edwin watts | motel6.com | walkinlab |
| eyeslipsface.com | mrs fields | webvitamins |
| famousfootwear.com | myfoodstorage.com | west music |
| fatcow.com | naartjie kids | wyzant |
| finishline.com | naturalizer.com | xero shoes |
| footballamerica | officedepot.com | zonediet |
| for sale by owner | organicindiausa.com | |
| framesdirect | orvis.com | |

95.     Upon information and belief, Defendants created fraudulent advertisements for at least each of the above merchants that violated the merchant's advertising contract terms and conditions and falsely identified WickFire as the source of the advertisements by including WickFire's THECOUPON.CO mark, references and links to WickFire's TheCoupon.Co website, and/or WickFire's unique tracking identifier.

## COUNT I

## FEDERAL FALSE DESIGNATION OF ORIGIN UNDER 15 U.S.C. § 1125(a)

96.     WickFire repeats and realleges each and every paragraph set forth above as if fully set forth again here.

97.     Defendants' aforementioned acts lead the public to believe that Defendants' goods,

services, or commercial activities originate with, are sponsored by, or otherwise approved by WickFire, constituting false designation of origin, misrepresentation of fact, unfair competition, and passing off in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

98.     Defendants created fraudulent advertisements that violated merchant advertiser and/or affiliate networks' terms and conditions and falsely identified WickFire as the source by including WickFire identifying information such as WickFire's THECOUPON.CO mark, references and links to WickFire's TheCoupon.Co website, and WickFire unique tracking identifiers.

99.     As exemplified by the dozens of violation notices WickFire received from merchants, Defendants' false designation of WickFire as the source of Defendants' fraudulent advertisements deceived WickFire's merchant customers and potential merchant customers into believing WickFire was the source of Defendants' fraudulent advertisements.

100.    Defendants' deception was material in that WickFire's compliance rating was tarnished, merchants like GlassesUSA barred WickFire from future business, and WickFire lost customer accounts and commissions as a result of Defendants' deception.

101.    Defendants caused the advertisements falsely attributed to WickFire to enter interstate commerce by publishing them on the internet.

102.    WickFire suffered lost customer accounts, lost commissions, and lost goodwill as a result of Defendants' false identification of WickFire as the source of Defendant's advertisements.

## COUNT II

### BUSINESS DISPARAGEMENT

103.    WickFire repeats and realleges each and every paragraph set forth above as if fully set forth again here.

104.     The foregoing acts of Defendants involve publishing disparaging statements about WickFire's economic interests.  Specifically, Defendants published advertisements that violated merchant advertiser and/or affiliate networks' terms and conditions and falsely stated that WickFire was the source of those advertisements, which concerned WickFire's economic interests by causing WickFire customers and potential customers to believe WickFire violates its contractual obligations to its customers and is an unreliable business partner.  Additionally, Defendants published emails to at least PersonaLabs (dated December 24, 2013), Schaaf-PartnerCentric/Shortorder (dated January 29, 2014), and Tamrick.biz (dated March 11, 2014) disparaging WickFire as unethical.

105.     The disparaging statements are false.  Defendants, not WickFire, are the source of the advertisements at issue.

106.     Defendants published its disparaging statements identifying WickFire as the source of the advertisements at issue and accusing WickFire of unethical behavior with malice and with intent to interfere with WickFire's economic interests.

107.     Defendants published the disparaging statements identifying WickFire as the source of the advertisements at issue and accusing WickFire of unethical behavior without privilege.

108.     Defendants' disparaging statements identifying WickFire as the source of the advertisements at issue and accusing WickFire of unethical behavior have caused, and will continue to cause, injury to WickFire which have resulted in damages.

109.     WickFire's injury resulted from Defendant's' malice, which entitles WickFire to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a)(2).

## COUNT III

### DEFAMATION

110.    WickFire repeats and realleges each and every paragraph set forth above as if fully set forth again here.

111.    The foregoing acts of Defendants involve publishing statements by written communication that assert as fact that WickFire was the source of advertisements that violated merchant and/or affiliate networks' advertiser terms and conditions. Additionally, Defendants published emails to at least PersonaLabs (dated December 24, 2013), Schaaf-PartnerCentric/Shortorder (dated January 29, 2014), and Tamrick.biz (dated March 11, 2014) disparaging WickFire as unethical.

112.    Defendants' statements refer to WickFire by including WickFire identifying information such as WickFire's entity name, WickFire's THECOUPON.CO mark, references and links to WickFire's TheCoupon.Co website, and WickFire unique tracking identifiers.

113.    Defendants' statements were defamatory because they unambiguously identify WickFire as being responsible for advertisements that violate merchants' and/or affiliate networks' terms, conditions, or policies or describe WickFire as unethical.

114.    Defendants' written statements were and are also libel per se under the common law and under Texas Civil Practice & Remedies Code section 73.001 because they injured WickFire in WickFire's internet marketing business and because they injured WickFire's reputation and exposed WickFire to financial injury.

115.    Defendants' written statements were false because WickFire is neither responsible for the advertisements at issue nor unethical.

116.    Defendants know that the statements are false.

117.    Defendants' false statements have caused, and will continue to cause, injury to WickFire which have resulted in damages, including at least lost customer accounts, lost commissions, and lost goodwill.

118.    Defendants, knowing the falsity of their statements, made such statements with actual malice, entitling WickFire to a presumption of general damages.

119.    WickFire's injury resulted from Defendants' malice, which entitles WickFire to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a)(2).

## COUNT IV

### TORTIOUS INTERFERENCE WITH EXISTING CONTRACT

120.    WickFire repeats and realleges each and every paragraph set forth above as if fully set forth again here.

121.    WickFire had valid contracts with each merchant on whose behalf WickFire published advertisements (*e.g.*, Freshology, ShortOrder, and all merchants identified in Paragraphs 72 and 93, above), with each affiliate network of which WickFire was a member (*e.g.*, Commission Junction, ShareASale, PepperJam), and with each search resulting advertising services entity through which WickFire published search result advertisements (*e.g.*, Google).

122.    Defendants knew or had reason to know of WickFire's contracts and WickFire's interest in the contracts because Defendants do business in the same industry and under the same contracts and/or types of contracts.  With respect to Freshology in particular, Defendants knew of WickFire's contract because Defendant TriMax knew that it was dropped from the Freshology account in favor of WickFire being Freshology's exclusive publisher.

123.    Defendants willfully and intentionally interfered with WickFire's valid contracts. Defendants' click fraud, misappropriation of genuine WickFire advertisements to deprive WickFire of commission revenue, and false attribution to WickFire of advertisements that violated

merchant and/or affiliate network terms and conditions prevented performance and/or made performance more burdensome, difficult, or expensive under WickFire's contracts with Freshology, ShortOrder, GlassesUSA, all merchants identified in Paragraphs 72 and 93 above, Commission Junction, ShareASale, PepperJam, and Google.

124.    Defendants' interference proximately caused injury to WickFire, which resulted in actual damage or loss to WickFire, including lost customer accounts, lost commissions, and lost goodwill.

125.    WickFire's injury resulted from Defendants' malice, which entitles WickFire to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a)(2).

## COUNT V

### TORTIOUS INTERFERENCE WITH
### PROSPECTIVE CONTRACT AND BUSINESS RELATIONS

126.    WickFire repeats and realleges each and every paragraph set forth above as if fully set forth again here.

127.    WickFire was prepared to enter into a contract and/or had ongoing business relationships, including WickFire's relationships with merchants, affiliate networks, and advertising services.  WickFire's membership in affiliate networks such as Commission Junction and ShareASale established a reasonable probability that WickFire would enter into a business relationship with at least each of the merchants listed in Paragraph 93 above.  As a specific example, the merchant GlassesUSA barred WickFire from participating in future GlassesUSA business as a result of Defendants' fraudulent advertisements falsely attributed to WickFire.

128.    As participants in the internet search result advertising industry, Defendants knew or had reason to know of WickFire's prospective contracts and/or business relationships and intentionally interfered with them.

129.    Defendants' publication, and false attribution to WickFire, of fraudulent advertisements were independently tortious and unlawful as demonstrated by at least the False Designation of Origination, Business Disparagement, Defamation, and Common Law Misappropriation asserted by WickFire.

130.    Defendants' interference proximately caused injury to WickFire at least in that the false attribution to WickFire of fraudulent advertisements harmed WickFire's affiliate ratings and were the reasons for lost customer accounts and lost commissions.

131.    WickFire's injury resulted from Defendants' malice, which entitles WickFire to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a)(2).

## COUNT VI

## MISAPPROPRIATION UNDER TEXAS COMMON LAW

132.    WickFire repeats and alleges each and every paragraph set forth above as if fully set forth again here.

133.    WickFire's legitimate advertisements, THECOUPON.CO mark, TheCoupon.Co website, and unique tracking identifiers were created through or a product of WickFire's extensive investment of time, labor, skill, and money.   Defendants appropriated and used WickFire's legitimate advertisements, THECOUPON.CO mark, TheCoupon.Co website, and unique tracking identifiers in competition with WickFire to create the false belief among WickFire's and TriMax's customers and potential customers that WickFire was running advertisements in violation of merchant and/or affiliate network terms and conditions, thereby gaining Defendants a special advantage over WickFire in competing for business by tarnishing WickFire's reputation and damaging its finances through lost revenue and increased costs.

134.    Such acts of misappropriation caused commercial damage to WickFire through lost

customer accounts, lost commissions, and lost goodwill for which WickFire is entitled to recover any and all remedies provided by Texas common law.

135.    WickFire's injury resulted from Defendants' malice, which entitles WickFire to exemplary damages under Texas Civil Practice & Remedies Code section 41.003(a)(2).

## COUNT VII

### CONSPIRACY

136.    WickFire repeats and alleges each and every paragraph set forth above as if fully set forth again here.

137.    Each of the Defendants is a member of a combination comprised of at least Defendant TriMax, Defendant Woodruff, Defendant WREI, and Defendant West.

138.    The object of Defendants' combination included accomplishing a number of unlawful purposes—namely, and at least, the commission of the following intentional torts against WickFire: business disparagement, defamation, tortious interference with existing contract, tortious interference with prospective contract and business relations; and misappropriation.

139.    As evidenced at least by the coordination of Google AdWords account activity, Defendants had a meeting of the minds on the object and/or course of action of the combination.

140.    Overt acts in furtherance of the combination's conspiracy include at least the following: impersonating Plaintiff WickFire and its principals by setting up fake, fraudulent Google AdWords accounts used to commit violations of industry agreements to which Plaintiff WickFire was a party; committing click fraud against Plaintiff WickFire; and placing and falsely attributing to Plaintiff WickFire fake Google AdWords advertisements that violated merchant and affiliate network terms and conditions.

141.    Defendants' wrongful acts were the proximate cause of harm to Plaintiff WickFire.

## Request for a Jury Trial

142.     WickFire requests a jury trial on all issues in this action so triable.

## Prayer for Relief

WHEREFORE, Plaintiff WickFire LLC prays for judgment against Defendants as follows and for the following relief:

A.     a judgment that Defendants have violated 15 U.S.C. § 1125(a);

B.     a judgment that Defendants have published disparaging false statements about WickFire's economic interests, with malice and with intent to interfere with WickFire's economic interests, which have caused WickFire injury;

C.     a judgment that Defendants have published false, defaming statements about WickFire, with knowledge that such statements are false, which have caused WickFire injury;

D.     a judgment that Defendants have tortiously interfered with WickFire's existing contracts, and that such interference proximately caused injury to WickFire;

E.     a judgment that Defendants have tortiously interfered with WickFire's prospective contracts and business relationships, and that such interference proximately caused injury to WickFire;

F.     a judgment that Defendants misappropriated WickFire's advertisements, TheCoupon.Co website and mark, and unique tracking identifiers in violation of Texas common law;

G.     a judgment that Defendants conspired with the object of accomplishing unlawful purposes through the intentional torts committed against WickFire and the related overt acts;

H.     a judgment that Defendants, their officers, directors, principals, agents, servants,

employees, attorneys, officers, directors, principals, and all persons acting in concert or participation with it who receive actual notice of the Order, be permanently enjoined from directly or indirectly:

(1)     using, in Defendants' internet advertisements, any of WickFire's web properties, affiliate links, affiliate information, or any other tracking information associated with WickFire to create the impression that WickFire is responsible for or otherwise associated with Defendant's advertisements;

(2)     passing off, inducing, or enabling others to pass off advertisements as advertisements by WickFire that are not produced under the control and supervision of WickFire and approved by WickFire;

(3)     committing any acts calculated to cause the public to believe that any of Defendant's advertisements, products, or services are WickFire's advertisements, products, or services, or are authorized by WickFire, in whole or in part, unless they are entirely such;

(4)     further damaging WickFire's goodwill and business reputation;

(5)     otherwise competing unfairly with WickFire in any manner, including without limitation, using a false designation of origin or false representations which misrepresent the nature, characteristics or qualities, source or origin of Defendant's products or services or commercial activities;

(6)     further interfering with WickFire's contracts, prospective contracts, and business relations;

(7)      misappropriating WickFire's advertisements, TheCoupon.Co website and mark, or unique tracking identifiers for Defendants' use;

-43-

(8)     destroying any records documenting the nature and scope of Defendants' activities directed at WickFire, including but not limited Defendants' improper keyword bidding activity, invalid clicks on WickFire advertisements, and advertisements created and placed to appear as though they originated from WickFire;

(9)     attempting, causing, or assisting in any of the above-described acts.

I.     a judgment that Defendants be directed to file with this Court and serve on WickFire within thirty (30) days after service of such injunction, a written report under oath pursuant to 15 U.S.C. § 1116 setting forth in detail the manner and form in which Defendants have complied with the injunction;

J.     a judgment that Defendants be required to recall all falsely-attributed advertisement placements, and notify all relevant affiliate networks, merchants, third-party monitoring partners, and advertising services that WickFire was not responsible for or associated with such advertisements;

K.     a judgment that Defendants be ordered to pay to WickFire all damages sustained from violations under 15 U.S.C. § 1125, and that WickFire be awarded Defendants' profits derived by reason of said acts, or as determined by said accounting;

L.     a judgment that such damages and profits be trebled and awarded to WickFire pursuant to 15 U.S.C. § 1117 on the grounds that Defendants' conduct have been willful, deliberate and in bad faith;

M.     a judgment that Defendants be required to account to WickFire for any and all profits derived by them, and all damages sustained by WickFire by reason of Defendants' acts complained of herein;

N.     a judgment that WickFire recover punitive damages in an amount to be determined

at trial;

O.      a judgment that Defendants be ordered to pay WickFire pre-judgment and post-

judgment interest on any amount awarded;

P.      a judgment that Defendants be found to have acted deliberately and in bad faith,

and that Defendants be ordered to pay WickFire its costs, disbursements and

attorneys' fees, as allowed by law; and,

Q.      a judgment that WickFire recover such other relief as the Court deems just and

equitable.


Dated: October 5, 2015                          Respectfully submitted,

                                                 /s/ Bradley D. Coburn
                                                Bradley D. Coburn
                                                Texas Bar No. 24036377
                                                DENKO COBURN LAUFF LLP
                                                3811 Bee Cave Road, Suite 204
                                                Austin, Texas 78746
                                                Telephone: (512) 906-2074
                                                Facsimile (512) 906-2075
                                                coburn@dcllegal.com

                                                Katherine M. Atlas
                                                Texas Bar No. 24080777
                                                ATLAS LAW PLLC
                                                2525 Robinhood Street
                                                Houston, Texas 77005
                                                Telephone: (713) 561-5544
                                                katlas@atlastriallaw.com

                                                ATTORNEYS FOR PLAINTIFF WICKFIRE, LLC