# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

WICKFIRE, LLC,

**Plaintiff,**

-vs-

Case No.  A-14-CA-34-SS

TRIMAX MEDIA, INC. *et al.*,

**Defendants.**

---

## O R D E R

BE IT REMEMBERED on the 12th day of February 2016, the Court held a hearing in the above-styled cause, and the parties appeared by and through counsel.  Before the Court is "Plaintiff WickFire and Third Party Defendants Hall and Brown's Partial Motion to Dismiss the TriMax Parties' Second Amended Counterclaim[s]" [#165], the "TriMax Parties'[1] Corrected Response to the WickFire Group's Motion to Dismiss" [#169], and the "Reply in Support of WickFire's Partial Motion to Dismiss the TriMax Parties' Second Amended Counterclaims" [#171].   Having

---

[1] The inability of the defendants in this case to correctly and consistently refer to themselves and the opposing parties in their pleadings is utterly incomprehensible to the Court.  Since this case was filed, the defendants have referred to themselves, the plaintiffs, and the third-party defendants by a dizzying array of differing names both individual and categorical that the Court will not take the time to enumerate here.  The defendants remain unable to accomplish the truly ground-level task of accurately identifying themselves and their opponents despite the Court's repeated admonishments that "[t]here is no 'group'" and that pleadings referencing "groups" of parties are improperly styled.  *E.g.*, July 8, 2015 Order [#132].  The plaintiffs are now mirroring the defendants' self-styling, perhaps in an effort to avoid additional confusion.  Referencing parties in groups or as groups, rather than individually, not only is nonsensical, poor practice, but also makes it unnecessarily difficult to ascertain which parties join in which pleadings.  Much as it pains the Court to have to do so, the Court hereby ORDERS the parties, be they human or entity, to refer to themselves in their pleadings by their individual names as listed on the court's electronic docket or abbreviated forms of those names.  To avoid any confusion whatsoever, absolutely no references to "the TriMax Group," the "TriMax Parties," the "WickFire Group," or the like are permitted in the parties' pleadings from this point forward.  If, *in the body of a pleading only*, it would be expedient in context to temporarily refer to more than one litigant under a single moniker, the parties may do so by clearly and simply indicating as such.  For example: "TriMax and Woodruff (collectively, TriMax)".

considered the documents, the governing law, the arguments of the parties at hearing, and the file as a whole, the Court now enters the following opinion and orders.

## Background

Plaintiff WickFire and Defendant TriMax are competitors in the pay-for-performance search engine marketing business, a type of performance-based internet marketing in which advertisers earn money only to the extent their ads are effective in driving customer traffic. Each party claims the other has fraudulently interfered with its business. Although this lawsuit was filed in January 2014, it has thus far been unnecessarily complex and remains at the motion to dismiss stage; both sides have filed hundreds if not thousands of pages of pleadings and exhibits asserting a variety of causes of action, ranging from RICO to antitrust to defamation to Lanham Act claims. The presently pending motion to dismiss, filed by WickFire and its principals, Third-Party Defendants Chet Hall and Jonathan Brown, seeks dismissal of the antitrust and unfair competition counterclaims filed by TriMax, Defendant Laura Woodruff, TriMax's CEO, Defendant WREI, Inc., and Defendant Josh West, WREI's CEO.

### A.    The Pay-For-Performance Search Engine Marketing Business

Pay-for-performance search engine marketing is an advertising model in which a merchant can target an ad to a consumer's interests by placing the ad alongside the results of an internet search performed by the consumer. To accomplish that goal, merchants partner with advertisers, often through agencies who manage merchants' advertising needs. Those advertisers generate ad campaigns and then pay search engines a fee for the right to place their ads alongside particular search terms. The advertisers are paid for their services by commission: advertisers earn money only

when a consumer clicks on an ad and buys something from the merchant.[2]  A merchant who sells coffee, for example, might wish to place an ad alongside the Google search results given to an internet user who Googles the search terms "dark roast coffee."  An advertiser would create an ad for the coffee merchant, and then pay Google for the right to place the ad alongside the results generated by those search terms.  The advertiser would then be paid by the merchant based on the number of people who, having Googled "dark roast coffee," clicked on the merchant's ad and purchased something from the merchant's website.

Advertisers pay Google for the right to place their ads alongside given search terms through a platform called Google AdWords.  When an advertiser submits a proposed ad, Google AdWords applies an algorithm to the ad which considers, among other factors, the quality of the ad, the relevance of the search terms selected, and the expected click-through rate.  Based on those factors, the algorithm calculates the "cost-per-click" for the ad, which is the amount of money Google charges the advertiser each time a consumer clicks on its ad.  Where multiple advertisers wish to place ads for the same merchant alongside the same search terms, however, the cost-per-click price is determined in part by auction.  Each competing advertiser must specify the highest cost-per-click price it is willing to pay, and that price ceiling becomes a factor considered by the algorithm in determining which ad will be the winning ad.[3]  Importantly, the process of determining ad rank is dynamic, and the cost-per-click can change throughout the duration of an ad campaign.

---

[2] While the action a consumer must take in order for the advertiser to be paid is most commonly a purchase, it could be any other specified action.

[3] Notably, the parties describe this mechanism differently.  TriMax alleges the winning ads are determined in the fashion described here, with cost-per-click ceiling considered by Google's algorithm in tandem with ad quality and search term relevance.  *See* Countercls. [#164] ¶¶ 6.3–6.5.  WickFire, in contrast, does not mention ad quality, search term relevance, or an algorithm in its allegations concerning Google's determination of ad placement, alleging only that the advertiser who makes the highest cost-per-click bid will prevail.  *See* Fourth Am. Compl. [#143] ¶¶ 22–25.  As this is WickFire's motion to dismiss, the Court accepts TriMax's allegations as true.

In addition to specifying the maximum cost-per-click it is willing to pay, an advertiser must also submit a "budget" for its ad—the total maximum amount it is willing to pay Google to display the ad. Once an advertiser's budget for an ad is exhausted, that ad campaign is "paused," meaning the ad is no longer displayed. Thus, the higher the cost-per-click, the fewer total clicks the advertiser is buying; a $10,000 budget will pay for 10,000 clicks at a $1.00 cost-per-click, but only 5,000 clicks at a $2.00 cost-per-click.

**B.      WickFire and TriMax**

As noted, WickFire and TriMax are both advertisers competing in the pay-for-performance search engine marketing business. Broadly, TriMax complains WickFire has engaged in three types of wrongful conduct: (1) solicitation of "kickback and exclusivity agreements"; (2) creation of "predatory ads"; and (3) defamation.

**1.      "Kickback and exclusivity agreements"**

In August and September 2012, WickFire and TriMax, respectively, launched advertising campaigns through an agency, FiveCentShine (FCS), on behalf of the merchant Freshology. In October 2012, WickFire allegedly "complained to FCS" about the competition it faced from TriMax, and asked FCS whether WickFire could become Freshology's exclusive advertiser. Countercls.[4] [#164] ¶ 10.1. WickFire "offered to provide FCS with a kickback in exchange for exclusivity," and FCS accepted WickFire's proposal. *Id.* After obtaining the exclusivity agreement, WickFire allegedly plagiarized TriMax's Freshology ads. *See id.* ¶ 11.

---

[4] While styled as the "Second Amended Counterclaims," the presently operative counterclaims are in fact Defendants' ninth attempt at pleading them. *See* Orig. Answer & Countercls. [#6]; Answer & Restated Countercls. [#63]; Answer & Reasserted Countercls. [#82]; New Defs.' Countercls. & Third-Party Claims [#85]; Am. Countercls. & Third-Party Claims [#90]; Omnibus Countercls. [#133]; Reasserted Countercls. [#147]; Am. Countercls. [#151]; Second Am. Countercls. [#164]. With a small prayer for the trees sacrificed on the altar of this litigation, the Court refers to the presently operative counterclaims simply as "Counterclaims."

In August 2012, TriMax launched an ad campaign for the merchant eFoodsDirect through a different agency, Commission Junction. *Id.* ¶ 9.2. WickFire was also advertising for eFoodsDirect, although through FCS. *See id.* ¶ 9.1. In November 2012, WickFire offered FCS the same exclusivity deal concerning eFoodsDirect it had offered concerning Freshology. *Id.* ¶ 12.1. FCS again accepted WickFire's proposal. Once again, after obtaining the exclusivity agreement, WickFire allegedly plagiarized TriMax's eFoodsDirect ads. *See id.* ¶ 13.2.

### 2. "Predatory ads"

According to TriMax, when WickFire and TriMax compete to place ads for the same advertiser, Google's algorithm "almost always favors TriMax's ads" because TriMax's ads "are simply better than Wickfire's[.]" *Id.* ¶ 15.2. Beginning in May 2013, however, WickFire began running what TriMax calls "predatory ads," which work by depleting competitor advertisers' budgets, permitting WickFire ads to "win" for any targeted search term–merchant pair even if the WickFire ad is of poor quality. *Id.* ¶ 16.

The alleged predatory ad scheme proceeds in three steps. First, WickFire submits a bid for an ad (the predatory ad) and set of search terms. The predatory ad, however, does not link to the relevant merchant's website, but to a placeholder website, such as a search engine or coupon website. *Id.* ¶ 16.2. Because that placeholder website is less relevant to the consumer's search than the relevant merchant's website, the predatory ad "will generally run directly below" the winning ad. *Id.* ¶ 16.3. Second, once the predatory ad is placed, WickFire incrementally increases its cost-per-click bid on the predatory ad, which drives up the cost-per-click price of its competitor's winning ad. *Id.* The higher cost-per-click price rapidly exhausts the budget for the winning ad, causing the ad campaign to pause and the winning ad to be removed from display. Third, with its competitor's

ad budget exhausted and campaign paused, WickFire immediately decreases its cost-per-click bid on the predatory ad, allowing a WickFire ad linking to the relevant merchant's website to move into the winning position. *Id.* ¶ 16.5.

TriMax alleges WickFire has used this scheme to target at least 517 different ad campaigns, *id.* ¶ 18.12 & App'x A–C, of which at least 145 were TriMax's. *See id.* at ¶ 28.4 & App'x A.

### 3.  Defamation

Finally, TriMax alleges WickFire has made a variety of defamatory statements about TriMax to "industry insiders" from late 2012 to the present: (1) a November 13, 2012 email to Commission Junction accusing TriMax of click fraud, a type of fraud in which an advertiser clicks on a competitor's ad multiple times for the purpose of generating more cost-per-click charges for the competitor; (2) November and December 2012 statements made to eFoodsDirect and Freshology "accusing TriMax of unethical business practices and blaming TriMax for the downturn in sales and traffic for the eFoodsDirect and Freshology websites"; (3) various unspecified statements[5] made to representatives from Commission Junction, Link Profits, IOLO, Schaaf PC, and Google AdWords Support; and (4) statements regarding this litigation made to various industry insiders. *See id.* ¶¶ 22–24.

### C.  Antitrust-Specific Allegations

Based on WickFire's conduct concerning the alleged "predatory ads," TriMax has raised an attempted monopolization claim under § 2 of the Sherman Act. The Counterclaims contain additional allegations relevant to that cause of action. Specifically, TriMax alleges that the relevant

---

[5] The Counterclaims include an appendix listing all the Bates numbers of the documents alleged to contain defamatory material, but do not include the statements themselves.

"geographic market extends, at a minimum, to the entire United States, and may extend internationally" and that the relevant "product market," the pay-for-performance search engine advertising market, is "small." *Id.* ¶¶ 25.2–.4. Quoting a previous WickFire pleading, TriMax alleges "[e]liminating a single competitor would alter the competitive landscape dramatically." *Id.* ¶ 25.4 (quoting Third Am. Compl. [#78] ¶ 4, sealed) (internal alterations omitted). Further, TriMax claims WickFire's "current and potential" competitors are "too weak" to compete against WickFire. *Id.* ¶ 26.2.

On the whole, TriMax alleges, WickFire's strategy leads to worse outcomes for merchants, because it elevates low-quality ads which ultimately result in fewer purchases from merchants' websites. *See id.* ¶ 26.4 ("When only one Search Partner advertises for a Merchant, the Search Partner does not need to produce the best possible ad and both traffic and sales decrease."). This, in turn, leads to merchants' exit from the market altogether. TriMax alleges 256 merchants have already left the market due to WickFire's conduct. *Id.* ¶ 28.6. Additionally, TriMax claims, "if WickFire is successful, competition will be eliminated" and prices will rise to a "supracompetitive" level, as evidenced by the "increased commissions charged by Wickfire in campaigns where Wickfire has successfully excluded TriMax and other Search Partners[.]" *Id.* ¶¶ 29.2–.3.

**D.     Procedural History**

WickFire initiated this action by filing its original complaint on January 13, 2014. *See* Compl. [#1]. TriMax answered the complaint and filed its original counterclaims on February 12, 2014. *See* Orig. Answer & Countercls. [#6]. WickFire filed its first amended complaint against TriMax and one or more John Does on August 27, 2014, *see* First Am. Compl. [#29], then on October 23, 2014, moved for leave to file a second amended complaint. *See* Mot. Leave [#39].

-7-

Following hearing, the Court granted WickFire's motion, and on November 17, 2014, WickFire filed its second amended complaint against TriMax, Woodruff, WREI, Inc., West, and one or more John Does. *See* Second Am. Compl. [#50].

The defendants filed a motion to dismiss the second amended complaint on December 18, 2014. *See* New Defs.' Mot. Dismiss [#62]. Following hearing, on January 29, 2015, the Court granted in part and denied in part the motion to dismiss and ordered WickFire to file an amended complaint. *See* Order of Jan. 29, 2015 [#76]. WickFire filed its third amended complaint on February 12, 2015, naming only TriMax, Woodruff, WREI, and West as defendants, all of whom answered and counterclaimed on February 26 and 27, 2015. *See* Third Am. Compl. [#78]; TriMax's Answer & Reasserted Countercls. [#82]; West Parties' Answer [#83]; Woodruff's Answer [#84]; New Defs.' Countercls. & Third-Party Claims [#85]. Woodruff, WREI, and West also raised third-party claims against Third-Party Defendants Hall and Brown. *See* New Defs.'s Countercls. & Third-Party Claims [#85].

Defendants then filed the "TriMax Parties' Amended Counterclaims and Third-Party Claims" on March 19, 2015. *See* Doc. #90. WickFire, Hall, and Brown separately moved to dismiss that pleading. *See* Mots. Dismiss [##101, 107]. Following hearing, the Court dismissed without prejudice the RICO and Sherman Act claims raised by Woodruff, WREI, and West, vacated the then-live scheduling order, and dismissed the remaining pending motions without prejudice. *See* Orders of June 10, 2015 [##123, 124].

Defendants then filed their "Omnibus Counterclaims" against WickFire, Hall, and Brown on July 8, 2015. *See* Omnibus Countercls. [#133]. WickFire again moved to dismiss Defendants' Sherman Act claim. *See* Mots. Dismiss [##135, 140]. On October 5, 2015, WickFire filed its Fourth

-8-

Amended Complaint [#143], which was followed by yet another iteration of Defendants' counterclaims. *See* Fourth Am. Compl. [#143]; Reasserted Countercls. [#147]. WickFire again moved to dismiss Defendants' Sherman Act claim. *See* Mot. Dismiss [#148]. While that motion to dismiss was pending, on November 30, 2015, Defendants filed their "Amended Counterclaims," their eighth attempt at an operative pleading. *See* Am. Countercls. [#151, sealed]. WickFire, Hall, and Brown moved to strike portions of the counterclaims and, once again, to dismiss Defendants' Sherman Act cause of action. *See* Mot. Strike [#]; Mot. Dismiss [#153]. In their response to the motion to dismiss, Defendants notified the Court they intended to file yet another set of amended counterclaims. *See* Resp. [#157]. On January 5, 2016, describing the case as "a mess," the Court ordered that Defendants' forthcoming amended counterclaims would be the final attempt permitted at pleading them. *See* Order of Jan. 5, 2016 [#162].

Thus, on January 7, 2016, Defendants filed their presently operative Counterclaims. *See* Countercls. [#164]; *supra* note 4. The Counterclaims raise the following causes of action: (1) on behalf of all Defendants against WickFire, attempt to monopolize in violation of § 2 of the Sherman Act; (2) on behalf of TriMax and Woodruff against WickFire, Hall, and Brown, defamation; (3) on behalf of TriMax against WickFire, Hall, and Brown, business disparagement, (4) tortious interference with prospective business relations, and (5) tortious interference with existing contract; and (6) on behalf of all Defendants against WickFire, Hall, and Brown, unfair competition. Defendants also request an injunction[6] enjoining WickFire, Hall, and Brown "from continuing their

---

[6] While the Counterclaims request a preliminary injunction, no motion for preliminary injunction has been filed.

use of the Predatory Ads and making defamatory statements" about Defendants; exemplary damages; and attorney's fees.[7]

On January 13, 2016, WickFire, Hall, and Brown filed their partial motion to dismiss, seeking dismissal of Defendants' Sherman Act and unfair competition claims. *See* Partial Mot. Dismiss [#165]. The motion has been fully briefed and is now ripe for decision.

Analysis

**I.      Motion to Dismiss**

**A.      Legal Standard**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  A motion under Federal Rule of Civil Procedure 12(b)(6) asks a court to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6).  The plaintiff must plead sufficient facts to state a claim for relief that is facially plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 566 U.S. at 678.  Although a plaintiff's factual allegations need not establish that the defendant is probably liable, they must establish more than a "sheer possibility" that a defendant has acted unlawfully. *Id.*  Determining

---

[7] Defendants' mishmash of different monikers for groups of parties and accidental misuse of those monikers makes it difficult to discern what causes of action are raised against whom. *See, e.g.*, Countercls. [#164] ¶ 31 (stating "*TriMax and Laura Woodruff* incorporate all allegations above" into their defamation claim, but further stating "*[t]he TriMax Parties'* [defamation-related] injury resulted from Wickfire's malice" (emphasis added)).  In all instances of confusion, the Court construes the claim as being raised by the first-mentioned group of defendants (e.g., the defamation claim is being raised by TriMax and Woodruff alone, not by all defendants).

plausibility is a "context-specific task," and must be performed in light of a court's "judicial experience and common sense." *Id.* at 679.

In deciding a motion to dismiss under Rule 12(b)(6), a court generally accepts as true all factual allegations contained within the complaint. *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 164 (1993). However, a court is not bound to accept legal conclusions couched as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Although all reasonable inferences will be resolved in favor of the plaintiff, the plaintiff must plead "specific facts, not mere conclusory allegations." *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1067 (5th Cir. 1994). In deciding a motion to dismiss, courts may consider the complaint, as well as other sources such as documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

## B.    Application

WickFire, Hall, and Brown seek dismissal of Defendants' counterclaims for attempt to monopolize in violation of § 2 of the Sherman Act and unfair competition. The Court considers each in turn, and finds the motion to dismiss should be granted in all respects.

### 1.    Attempted monopolization—Sherman Act § 2

Section 2 of the Sherman Act makes it a crime for any person to "attempt to monopolize . . . any part of the trade or commerce among the several States, or with foreign nations[.]" 15 U.S.C. § 2. An attempted monopolization claim "arises when the danger of monopolization is clear and present, but before a full blown monopolization has necessarily been accomplished." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 384 (E.D. La. 2013) (quoting *Alaska*

*Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 541–42 (9th Cir. 1991)). An attempted monopolization claim thus has three elements: (1) the defendant engaged in predatory or anti-competitive conduct; (2) with the specific intent to monopolize; and (3) with a dangerous probability of attaining monopoly power. *Taylor Publ'g Co. v. Jostens, Inc.*, 216 F.3d 465, 474 (5th Cir. 2000) (citing *Spectrum Sports, Inc. v. McQuillian*, 506 U.S. 447, 456 (1993)). Here, WickFire argues Defendants have failed to allege sufficient facts in support of all three elements. Because the Court agrees Defendants have failed to allege a dangerous probability of attaining monopoly power, the Court grants WickFire's motion to dismiss Defendants' attempted monopolization claim and declines to reach WickFire's arguments concerning intent or anti-competitive conduct.

"In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market." *Spectrum Sports*, 506 U.S. at 456; *see also Dimmitt Agri Indus., Inc. v. CPC Int'l, Inc.*, 679 F.2d 516, 521 (5th Cir. 1982) ("[E]vidence of a defendant's market share is the principal tool used by courts to determine the existence of monopoly power."). Indeed, the Fifth Circuit has held that a market share of below ten percent, absent a showing of special market conditions, will not support a finding of attempt to monopolize as a matter of law. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 491 (5th Cir. 1984). As such, "[m]arket definition is a necessary component of th[e] analysis." *Pool Prods.*, 940 F. Supp. 2d at 385.

WickFire argues Defendants fail to allege a dangerous probability WickFire will attain monopoly power because: the counterclaims "contain no allegations whatsoever concerning WickFire's market share"; Defendants fail to plead the size of the product market; Defendants fail to plead the identities of or market shares of their competitors; Defendants fail to identify substitute

-12-

products within the product market; and the allegation the geographic market "may be" international is improper. *See* Partial Mot. Dismiss [#164] at 5–10. Defendants respond that their "allegations satisfy what Rule 8(a) requires of a market definition" because they have alleged that the market is small, has high barriers to entry, and demand is unlikely to be absorbed by other online advertisers. *See* Resp. [#169] at 10–12. According to Defendants, they are not required to define the product market with mathematical precision at this stage of the proceedings, and WickFire is attempting to require Defendants to meet a summary judgment standard at the motion to dismiss stage.

The Court agrees with WickFire that Defendants' allegations fail to state a plausible claim for relief. While Defendants do define the relevant product market as the pay-for-performance search engine advertising market, they define the geographic market as, at smallest, the nation, and at largest, the globe—and allege no facts concerning WickFire's share of that market or the number of WickFire's competitors therein. While Defendants are correct that they need not define the market with mathematical precision, the mere assertion that the market is "small" is not enough, even when coupled with allegations regarding the nature of the alleged anti-competitive conduct. *See, e.g.*, *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1553 (S.D. Tex. 1991) (dismissing attempted monopolization claim where claimant failed to allege supporting facts indicating defendant "ha[d] some legally significant share of the market"); *Felder's Collision Parts, Inc v. General Motors Co.*, 960 F. Supp. 2d 617, 627–28 (M.D. La. 2013) ("To establish a relevant geographic market, Felder's must allege further detail regarding the number of competitors in the geographic area[.]").

Additionally, Defendants fail to allege sufficient facts concerning the strength of WickFire's competitors. Measurement of market power requires consideration not only of market share, but also

of the strength of the competition, among other factors. *Felder's Collision Parts*, 960 F. Supp. 2d at 628 (citing *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 513 (3d Cir. 1994)).  Defendants' sole allegation concerning the strength of WickFire's competitors is that they "are too weak to constrain Wickfire's prices."  Countercls. [#164] ¶ 26.2.  This conclusory allegation is insufficient to establish WickFire holds market power.  *See id.* at 628 ("[A] naked assertion of market domination is not legally sufficient under the Fifth Circuit's standards to establish market power.").

Because Defendants fail to sufficiently allege the size of the relevant market, WickFire's share of that market, or information about WickFire's competitors in the market, Defendants fail to plausibly allege that WickFire has a dangerous probability of acquiring monopoly power.  As such, Defendants' Sherman Act counterclaim is subject to dismissal.

### 2.    Unfair competition

Under Texas law, unfair competition is not an independent cause of action; rather, it is an "umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters."  *U.S. Sporting Prods., Inc. v. Johnny Stewart Game Calls, Inc.*, 865 S.W.2d 214, 217 (Tex. App.—Waco 1993, writ denied) (quoting *Am. Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 14 (5th Cir. 1974)).  While the precise contours of the doctrine are unclear, it is established that to plead unfair competition, a claimant must at least identify an independent "illegal act by the defendant which interfered with the plaintiff's ability to conduct its business" and which "must at least be an independent tort."  *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 486 (5th Cir. 2000) (citing *Schoelkopf v. Pledger*, 778 S.W.2d 897, 904–05 (Tex. App.—Dallas 1989, writ denied)).   "[C]ourts have identified several causes of action[] that fall under the penumbra of unfair competition under Texas law," including

-14-

"trade-secret law, 'palming off' or passing off, and misappropriation[.]" *Seatrax, Inc. v. Sonbeck Int'l, Inc.*, 200 F.3d 358, 368 (5th Cir. 2000) (quoting *U.S. Sporting Prods.*, 865 S.W.2d at 216).

First, the Court notes that Defendants raise a cause of action for common law unfair competition on behalf of "the TriMax Parties," apparently meaning all defendants.  Countercls. [#164] ¶ 35.1.  To the extent this claim is asserted on behalf of WREI or Josh West, it is dismissed, as the Counterclaims allege no facts whatsoever supporting such a claim (a conclusion Defendants do not challenge).  *See* Resp. [#169] at 19–20 (characterizing the unfair competition claim as belonging to TriMax and Woodruff).  Additionally, the Court finds Woodruff's unfair competition claim against WickFire must be dismissed, as Defendants have not alleged Woodruff did business with TriMax in her individual capacity.

Thus, only TriMax's unfair competition claim remains.  According to TriMax, that claim should be permitted to proceed, as TriMax has asserted the independent torts of defamation, business disparagement, tortious interference with prospective business relations, and tortious interference with existing contracts alongside it.  *See* Resp. [#169] at 19.

The Court disagrees with TriMax.  As WickFire points out, the Texas Supreme Court has recognized unfair competition claims only in the context of misappropriation of trade secrets.  *See First Nat'l Bank v. Levine*, 721 S.W.2d 287, 289 (Tex. 1986); *Wissman v. Boucher*, 240 S.W.2d 278, 281 (1951).  Additionally, the Fifth Circuit has recognized the existence of "[a] trademark infringement and unfair competition action under Texas common law[.]"  *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 235 n.7 (5th Cir. 2010) (quoting *Horseshoe Bay Resort Sales Co. v. Lake Lyndon B. Johnson Improvement Corp.*, 53 S.W.3d 799, 806 n.3 (Tex. App.—Austin 2001, pet. denied)).  Here, however, TriMax's unfair competition claim is not grounded in trademark or

-15-

trade secret law, and TriMax has failed to point the Court to any Texas or Fifth Circuit authority recognizing a Texas unfair competition claim premised upon defamation, business disparagement, tortious interference with prospective business relations, or tortious interference with contracts, and the Court's independent research has not uncovered such a case. *Cf. Fjell Tech. Grp. v. Unitech Int'l, Inc.*, NO. 14-14-00255-CV, 2015 WL 457805, at *8 (Tex. App.—Houston [14th Dist.] Feb. 3, 2015, pet. filed) (analyzing unfair competition claim together with trade secret claims and separately from claims for business disparagement and tortious interference with business relationships). The Court declines to articulate a new independent tort permitting maintenance of an unfair competition claim under Texas law. As such, TriMax's unfair competition claim must also be dismissed.

## Conclusion

Defendants' Sherman Act and unfair competition counterclaims fail to state a claim for relief. Further, as the Court warned in its January 5, 2016 Order, this ninth attempt at pleading their counterclaims was Defendants' last. Consequently, Defendants' Sherman Act and unfair competition claims are dismissed without leave to replead. Defendants' unchallenged counterclaims, including the claims for defamation, business disparagement, tortious interference with prospective business relations, and tortious interference with existing contract, remain live.

Accordingly:

IT IS ORDERED that "Plaintiff WickFire and Third Party Defendants Hall and Brown's Partial Motion to Dismiss the TriMax Parties' Second Amended Counterclaim[s]" [#165] is GRANTED; and

IT IS FINALLY ORDERED that Defendants' claims under § 2 of the Sherman Act and for unfair competition under Texas common law are DISMISSED WITHOUT PREJUDICE.

SIGNED this the _24th_ day of March 2016.

*Sam Sparks*

SAM SPARKS
UNITED STATES DISTRICT JUDGE