**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **WICKFIRE, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 1:14-cv-00034 (SS)** |
| **vs.** | § | |
| | § | |
| **TRIMAX MEDIA, INC., LAURA** | § | **JURY DEMANDED** |
| **WOODRUFF, WREI, INC., and JOSH** | § | |
| **WEST,** | § | |
| | § | **MOTION FOR PARTIAL** |
| **Defendants.** | § | **SUMMARY JUDGMENT ON** |
| | § | **BEHALF OF WICKFIRE LLC,** |
| | § | **CHESTER LEE HALL, AND** |
| | § | **JONATHAN BROWN** |
| **TRIMAX MEDIA, INC. and LAURA** | § | |
| **WOODRUFF,** | § | |
| | § | |
| **Counter - Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **WICKFIRE, LLC,** | § | |
| | § | |
| **Counter - Defendant.** | § | |
| | § | |
| | § | |
| | § | |
| **TRIMAX MEDIA, INC. and LAURA** | § | |
| **WOODRUFF,** | § | |
| | § | |
| **Third Party Plaintiffs,** | § | |
| | § | |
| **vs.** | § | |
| | § | |
| **JONATHAN BROWN and CHET** | § | |
| **HALL,** | § | |
| | § | |
| **Third Party Defendants.** | § | |
| | § | |

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF UNDISPUTED FACTS .................................................................. 2

    A.    Google's AdWords Second Price Auction ........................................... 2

    B.    WickFire's TheCoupon.Co Website ................................................... 3

    C.    TriMax's Increased Costs Result From Its Own Overbidding, Not Tortious Interference From WickFire. ......................................... 4

    D.    TriMax Frames WickFire for Trademark Violations Using Fake AdWords Accounts. ....................................................................... 4

        1.    TriMax's Static IP Address Created and Accessed the 151 Account, a Fake Google AdWords Account in the Name of WickFire's Co-Founder. ......................................... 5

        2.    TriMax's Static IP Address Created and Accessed the 315 Account, a Fake Google AdWords Account in the Name of WickFire's Co-Founder. ......................................... 6

        3.    Other Undisputed Evidence Implicates TriMax in Creating Additional Fake Accounts Framing WickFire for Trademark Violations. ...................... 7

PROCEDURAL HISTORY ............................................................................................ 9

STANDARD OF REVIEW ............................................................................................ 9

ARGUMENT ................................................................................................................. 10

    A.    TriMax's Claim for Tortious Interference With Prospective Business Relations Fails Because WickFire's Bidding Was Legitimate Competition and TriMax Did Not Lose Any Reasonably Certain Contracts As A Result of WickFire's Competition. ........................................................................ 10

        1.    Bidding Against a Competitor is not Tortious. ........................... 10

        2.    TriMax Has Not Identified a Single Contract that TriMax Would Have Entered into with Reasonable Probability Absent Competition from WickFire. ......................................... 12

        3.    The Alleged Defamation Did Not Result in Loss of Any Contracts. .......... 12

    B.    TriMax's Claim for Tortious Interference With Existing Business Relations Does Not Raise a Genuine Issue of Material Fact Because WickFire's Conduct Was Not Unlawful. .......................................................... 13

        1.    TriMax's Has Not Established An Independent Tort To Support Its Claim for Tortious Interference With Existing Contracts. ......................... 13

i

2.   TriMax's Miscellaneous Other Allegations Do Not Salvage Its Tortious Interference Claim. ........................................................................ 14

C.   TriMax and Woodruff Are Barred from Asserting Claims For Defamation and Business Disparagement Because They Did Not Request a Retraction Pursuant to Texas's Defamation Mitigation Act. .................................................. 15

1.   The Defamation and Business Disparagement Counterclaims are Barred Because TriMax and Woodruff Did Not Comply With Texas's Defamation Mitigation Act. ........................................................................ 15

2.   TriMax and Woodruff's Defamation Claims Also Fail Because WickFire's Statements Were Truthful and Did Not Damage TriMax. ......... 16

3.   TriMax and Woodruff's Claims for Business Disparagement Fail Because WickFire's Statements Were Truthful, Not Malicious, and Did Not Cause Damages. ........................................................................... 17

D.   There Is No Basis For Subjecting Mr. Hall or Mr. Brown to Individual Liability Under TriMax and Woodruff's Third Party Claims. .............................. 18

E.   Summary Judgment Is Appropriate On WickFire's Lanham Act Claim Because TriMax Created and Used Fake AdWords Accounts to Frame WickFire for Trademark Violations. ....................................................................... 18

CONCLUSION ....................................................................................................................... 21

CERTIFICATE OF SERVICE ............................................................................................... 22

## TABLE OF AUTHORITIES

### CASES

*Alum-A-Fold Shutter Corp. v. Folding Shutter Corp.*, 441 F.2d 556, 557 (5th Cir. 1971) .......... 18

*Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003)..................................................... 10

*Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 207 (Tex. 2002 ...................................................... 13

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)........................................................................................................ 9

*Coinmach Corp. v. Aspenwood Apt. Corp.*, 417 S.W.3d 909, 924 (Tex. 2013) ........................... 10

*Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex. 1976), cert. denied, 429 U.S. 1123, 51 L. Ed. 2d 573, 97 S. Ct. 1160 (1977) ................................................................................. 16

*Granada Biosciences, Inc. v. Forbes, Inc.,* 49 S.W.3d 610, 616 (Tex. App.—Houston [14th Dist.] 2001) ..................................................................................................................................... 17

*Hammond v. Uriegas*, No. 5:15-CV-00579-RP (W.D. Tex. Dec. 29, 2016) (Pitman, J.) ........... 16

*Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex.  1995) ........................................................... 18

*Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-0832-RF, 2005 U.S. Dist. LEXIS 32213, at *5 (W.D. Tex. 2005). ........................................................................................... 17

*Peterson v. Dean Witter Reynolds, Inc.*, 805 S.W.2d 541 (Tex. App.—Dallas 1991, no pet.) .... 15

*Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex. 1995)............................. 16

*Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006) .................................................................................................................... 12

*Union Planters Nat'l Leasing, Inc. v. Woods*, 687 F.2d 117, 119 (5th Cir. 1982)......................... 2

*Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001). ..................................... 10, 13

*WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 573-74 (Tex. 1998) ........................................ 17

*Wiley v. State Farm Fire and Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). ............................... 10

### STATUTES

15 U.S.C. § 1125(a)(1)................................................................................................................ 17

Pursuant to Fed. R. Civ. P. 56, Plaintiff WickFire LLC and Third Party Defendants Chester Lee Hall and Jonathan Brown respectfully request that the Court grant summary judgment (1) on all remaining counterclaims asserted by TriMax Media LLC and Laura Woodruff and (2) on WickFire's affirmative claim under the Lanham Act.

## PRELIMINARY STATEMENT

WickFire and TriMax are direct competitors offering internet marketing services. In January 2014, WickFire filed this lawsuit, alleging that TriMax placed hundreds of fake Google AdWords advertisements attributed to WickFire that violated third party trademarks in order to frame WickFire for trademark violations. Since then, TriMax and its owner, Laura Woodruff, have inflated the costs of this case and delayed its resolution by falsely denying responsibility for the fake advertisements and asserting an ever-shifting landscape of derogatory accusations against WickFire and its two founders (which, to date, have included baseless allegations under RICO, the Sherman Act, and other allegations stricken by the Court as "wholly irresponsible" and sealed *sua sponte*). Discovery is now closed, and TriMax has established nothing more than WickFire's legitimate competitive activity and truthful statements regarding the facts of this case.

Meanwhile, WickFire has established conclusive evidence of liability for the fake ads that Defendants cannot genuinely rebut. Google produced business records documenting fake Google AdWords accounts created in the names of WickFire's two founders. These fake accounts were used to run thousands of ads linked to WickFire's coupon website and attributed to WickFire. These fake ads made it appear that WickFire had violated the trademarks of well-known brands like Walgreens, Verizon Wireless, and others. Google's documentation shows every internet connection (the internet protocol address, or "IP address") that accessed these fake accounts. TriMax's internet connection, which operates out of a private server in Defendant Woodruff's home, accessed two of the fake accounts. No reasonable jury could conclude that TriMax did not

1

place these advertisements.  TriMax's mere denial of its own guilt does not create an issue of fact

to withstand summary judgment.  *Union Planters Nat'l Leasing, Inc. v. Woods*, 687 F.2d 117, 119

(5th Cir. 1982).  Although the factfinder will need to determine damages, WickFire requests that

the Court narrow the factual issues for trial by granting summary judgment in WickFire's favor on

liability for its Lanham Act claim and on TriMax and Woodruff's remaining counterclaims.

## STATEMENT OF UNDISPUTED FACTS

Plaintiff WickFire LLC is a startup based in Austin, Texas.  It began operating in 2012 and

was only two years old when it was forced to file this action against Defendant TriMax Media,

LLC.  Defendant Laura Woodruff is the CEO and sole owner of Defendant TriMax, a competitor

in the field of search engine marketing.   Defendant Josh West is the Director of Business

Development for TriMax and Woodruff's nephew.   TriMax and Woodruff have asserted

counterclaims against WickFire and third party claims against Chester Lee Hall and Jonathan

Brown.  Mr. Hall and Mr. Brown are the founders of WickFire.

## A.    GOOGLE'S ADWORDS SECOND PRICE AUCTION

Search engine advertising is implemented through programs operated by search engines,

such as Google, Bing, and Yahoo!  (Dkt. 164 at ¶5.2.)  Advertisers bid for position in the search

results page for any given set of search terms.  (Dkt. 164 at ¶6.3.)  Google runs an auction to

determine the placement of advertisements in its search results under a program called Google

AdWords.  (Dkt. 164 at ¶6.3.)  A new auction is conducted instantly each time a search query is

received.  (A. 18.)[1]  Advertisers (such as TriMax or WickFire) submit a bid to Google, which is

the amount they agree to pay Google when a consumer clicks on their advertisement.  (*Id.*)  These

bids can be changed at any time.  (*Id.*).  Google then determines an ad rank for every bidder in the

---

[1]  References labeled "A." refer to Plaintiff WickFire and Third Party Defendants Chester Lee Hall and Jonathan
Brown's Appendix in Support of Motion for Summary Judgment, attached hereto.

auction.  (A. 19.)  The advertiser whose ad rank is highest will get the top spot on the search results page, the second highest rank obtains the second slot, and so on.  (*Id*.)  Ad rank is based in part on the advertiser's bid.  (*Id*.)  A higher bid will result in a higher ad rank, all other factors being equal. (*Id*.)  When two advertisers are bidding to win the auction but both are attempting to send users to a single destination page (such as, directly to a merchant's website), Google only allows one direct-linked advertisement to display.  (A. 19.)  Otherwise, Google runs a second-price auction to determine the price each advertiser pays for a user's click.[2]  The rules of the AdWords auction are set by Google, not WickFire or TriMax.

## B.      WICKFIRE'S THECOUPON.CO WEBSITE

WickFire offers promotional services through its coupon website, TheCoupon.Co, and review website, HighlightReviews.com.  TheCoupon.Co contains individual webpages for each merchant, where one can find offers for discounts, free shopping and other promotional incentives. (A. 2-3.)  If the user selects an offer, he or she is then directed to the merchant's websites, where sales occur.  (*Id*.)  WickFire's coupon and review sites use the same affiliate tracking link technology that WickFire and TriMax use in direct advertising.  (*Id*.)  WickFire earns commissions on sales generated through TheCoupon.Co, just as it does when it sends users directly to merchant websites.  (*Id*.)  A small identifier in a temporary folder on the customer's computer, commonly called a "cookie," is used to track sales originating from both direct and indirect ad.  (*Id*.)  This technology is the same whether the affiliate directs traffic to the merchant's site or through a secondary site, such as a coupon or review site.[3]

---

[2]    In a second price auction, the advertiser that obtains the top slot does not pay the price per click in their bid. Instead, they pay the price per click necessary to just barely rank ahead of the advertiser in the second spot.

[3]    TriMax also bids on keywords directing traffic to third party sites while simultaneously directing traffic on the same keywords to merchant pages using its affiliate links.  Although TriMax denied this practice in its discovery responses and affirmative expert liability report, its Google accounts demonstrate that it did. (A. 270, 332.)

## C.   TRIMAX'S INCREASED COSTS RESULT FROM ITS OWN OVERBIDDING, NOT TORTIOUS INTERFERENCE FROM WICKFIRE.

TriMax's counterclaims allege that after WickFire began competing in this marketplace, TriMax has paid more to win scarce advertising space for its own ads.  Essentially, TriMax complains about paying higher prices for its winning advertisements.  But these higher prices are due to TriMax's overbidding, in which TriMax places bids that are higher than it wants to pay for advertising space.  WickFire does not control TriMax's bids.  TriMax alone controls its bids. TriMax has never been charged more than it bid.  (A. 20.)  TriMax could reduce its costs by reducing its bids, but it chooses not to because overbidding gives TriMax an advantage in Google's auction.  TriMax complained about its increased costs to Google prior to the litigation and Google determined that WickFire had not violated any of its policies.  When Defendant West raised this issue with Google, he received a response from Google AdWords stating that "it appears that the account is not doing anything against our policies. Our policies cover a wide range of violations, but our team believes this falls under competition."  (A. 39.)  Undeterred, TriMax asks this Court to create an unprecedented cause of action under which it may sue a competitor because competition has negatively affected its own profits.

## D.   TRIMAX FRAMES WICKFIRE FOR TRADEMARK VIOLATIONS USING FAKE ADWORDS ACCOUNTS.

TriMax's counterclaims do not arise in a vacuum.  They were asserted by Defendants to delay this action and distract the Court and jury from TriMax's unscrupulous practices.  Prior to initiating this lawsuit, WickFire's founders became aware of hundreds of fake advertisements framing WickFire for trademark violations.  Discovery has revealed undisputed evidence that TriMax was responsible for creating fake accounts in the name of WickFire's founders that placed thousands of these fake ads, designed to frame WickFire for trademark violations.

4

1.   *TriMax's Static IP Address Created and Accessed the 151 Account, a Fake Google AdWords Account in the Name of WickFire's Co-Founder.*

Google AdWords account number 151-242-3873 (the "151 account") is an AdWords account created in the name of Jon Brown, WickFire's co-founder.  (A. 56.)  Mr. Brown did not create the 151 Account.  (A. 2.)  Of the 1,861 advertisements in the 151 Account, 1,858 of them are fake ads directing to TheCoupon.Co or containing WickFire's tracking IDs.  (A. 5, 439-552.)

On November 11, an internet connection using TriMax's static, publicly registered IP address created the 151 Account.  Between November 12 and November 27, 2013, TriMax's IP address accessed the 151 Account and made hundreds of changes within the account. (A. 64-74.) The IP address that created and accessed the 151 Account was controlled and used exclusively by TriMax between November 11 and November 27, 2013.  (A. 22, 76.)  During this period, TriMax's IP address operated out of a private server located in Defendant Woodruff's home.  (A. 285-6.)[4]

Undisputed evidence concludes that TriMax created and accessed the 151 Account.  During her deposition, Defendant Woodruff admitted that TriMax's internet connection served her home address and that her home computer accessed that connection directly.  (A. 285, 288.)  Third party records from AT&T confirm that the IP address that created and accessed the 151 Account served Defendant Woodruff's home and was leased by and assigned to TriMax between November 11, 2013 and November 27, 2013.  (A. 76-77.)  TriMax's own expert, Dr. Michael Shamos, concluded that "[o]nly a single IP address, 12.177.112.66, is owned by TriMax."  (A. 22.)  Google's documentation for the 151 Account was available to TriMax while Dr. Shamos drafted his expert

---

[4]   TriMax's internet connection also allows users to log in remotely.  (A. 285.)  In discovery, TriMax produced a log of remote connections to its internet connection.  No remote connections occurred on November 12, November 15, November 17, November 18, November 22, or November 26, 2013.  (A. 80-83.)  *For those dates, on which TriMax's IP address accessed the 151 Account, the only internet connection using TriMax's IP Address was in Woodruff's home.*  On November 11, 13, and 27, 2013, the only remote connection was the username "Sean."  (*Id.*)  "Sean" is the username of TriMax's Director of Information Technology.  (A. 87.)

report.  However, counsel for TriMax did not provide Dr. Shamos with the documentation for the 151 account, leading Dr. Shamos to mistakenly opine that "this IP address was never used to access a Concealed AdWords Account." (*Id.*)  The failure to provide Dr. Shamos with any documentation for the 151 Account is particularly significant given that counsel for TriMax sent him all the other documents from same Google production.  (A. 24-37, 43-45.)  In light of counsel's failure to disclose the 151 account to him, Dr. Shamos's report does not provide a basis for denying summary judgment.  The change history for the 151 Account shows that the 151 account was, in fact, accessed by TriMax's static IP address.  (A. 64-74.)

     2.     *TriMax's Static IP Address Created and Accessed the 315 Account, a Fake Google AdWords Account in the Name of WickFire's Co-Founder.*

Google AdWords account number 315-733-4659 (the "315 Account") is an AdWords account that was created in the name of Jon Brown, WickFire's co-founder.  (A. 89.)  Mr. Brown did not create the 315 Account.  (A. 2.)  Of the 799 advertisements in the 315 Account, 707 of them are fake ads directing to TheCoupon.Co or containing WickFire's tracking IDs, a unique identifier used to track commissions and monitor trademark violations.  (A. 5; A. 789-915.)  On December 11, 2013, an internet connection using TriMax's static IP address accessed the 315 Account.  (A. 97-98.)  The static IP address that created and accessed the 151 Account was controlled and managed by TriMax on December 11, 2013. (A. 22).  On December 11, 2013, TriMax's IP address operated out of a private server located in Woodruff's home. (A. 87, 285-6.)[5]

---

[5]    Again, no remote connections occurred through TriMax's VPN on December 11, 2013.  (A. 80-83.)  The internet connection that accessed the 315 Account was in Woodruff's home.

3.     *Other Undisputed Evidence Implicates TriMax in Creating Additional Fake Accounts Framing WickFire for Trademark Violations.*

Google also identified five additional fake AdWords accounts: (1) Account Number 238-011-7240 in the name of Mr. Hall, one of WickFire's founders, containing 7 fake WickFire ads; (2) Account Number 153-981-7026 in the name of Jon Brown, one of WickFire's founders, containing 27 fake WickFire ads; (3) Account Number 127-791-4726 in the name of Katie Carmichael, Mr. Hall's sister, containing 1,324 fake WickFire ads; (4) Account Number 414-815-2638 in the name of Mark Dunne, a third party in this industry, containing 352 fake WickFire ads; and (5) Account Number 407-393-4981 in the name of Jon Fisher, another third party in the industry, containing 1,462 fake WickFire ads.  (A. 100-132; 927-1220.)  Each of these accounts placed fake advertisements that violated third-party trademarks while directing to WickFire's TheCoupon.co website and/or containing WickFire-identifying tracking IDs.  (*Id*; A. 5.)

Google's business records show that the same IP addresses accessed these fake accounts and also TriMax's legitimate AdWords accounts.  Although these IP addresses are not publicly registered to TriMax, they appear in the logs of TriMax's real AdWords accounts, showing that they were used by TriMax.  For instance, on December 2, 2013, a single IP address made 133 changes in the 315 Account between 9:36 a.m. and 11:24 a.m.  (A. 134-137.)  The same IP address also accessed one of TriMax's legitimate AdWords at 9:33 a.m., at 10:19 a.m., at 10:21 a.m., at 10:25 a.m., and at 11:38 a.m. on the same morning.  (A. 139-140.)[6]  The same pattern occurred with another IP address on November 26, 2013, when a single IP address linked to Josh West's email address simultaneously accessed two fake accounts and two legitimate TriMax accounts (A. 142-157), providing further evidence that TriMax is responsible for the fake accounts.

---

[6]    When logged into TriMax's legitimate AdWords account, the user associated with this IP address is Defendant Josh West's email address.  (A. 139-140, 157.)

Another IP address accessed five of the fake accounts between December 2, 2013 and December 9, 2013, including the 151 Account and the 315 Account.[7] When WickFire subpoenaed AT&T for its user records for that IP address, AT&T identified Defendant Woodruff's mother, Dorothy West, as owning the account for that unique IP address.   (A. 160-162.)

Finally, the 151 Account, the 315 Account, and the additional fake AdWords accounts were funded using American Express prepaid credit cards. American Express produced documents showing the physical retail locations where these cards were purchased.   Three of the thirteen American Express cards were purchased at a single CVS Pharmacy located in Allen, Texas, within 1 mile of Defendant Woodruff's home address.  (A. 234, 237, 240.)  One of the thirteen American Express cards were purchased at a Walgreens located in Lubbock, Texas, within 6 miles of Defendants Josh West's address.  (A. 255.)  Two of the thirteen American Express cards were purchased at a different Walgreens in Lubbock, within 7 miles of Defendant West's address. (A. 252, 264.)   And six of the thirteen American Express cards were purchased at a single Wal-Mart in Longview, Texas, within 5 miles of Defendant Woodruff's mother's address. (A. 228, 231, 243, 246, 249, 258.)  The final American Express card was used to make a purchase in Early, Texas on September 19, 2015, twelve miles from Defendant West's current home. (A. 265, 334.)  Notably, the purchase in Early, Texas was twenty-one months after the initiation of this litigation, showing that West still had possession of the American Express card but did not disclose it in discovery.

---

[7]    On December 2, 2013, Defendant Woodruff's mother's IP address accessed the 153 Account.  (A. 183-199.)
On December 5, 2013, the same IP address accessed the 153 Account.  (*Id*.)  On December 7, 2013, the same IP address accessed the 315 Account.  (A. 201-220.)  On December 8, 2013, the same IP address accessed the 151 and the 153 Accounts.  (A. 183-220.)  On December 9, 2013, the same IP address accessed the 151 Account, the 127 Account, and the 414 Account.  (A. 164-181; 354-357.)

## PROCEDURAL HISTORY

The Court is well aware of the procedural history of this case. (Dkt. 230.) For more than two years, TriMax has attempted to repackage its complaints over WickFire's competitive activity under every legal theory its attorneys can muster.[8] In June 2015, TriMax attempted to plead these facts as a claim under RICO. The Court dismissed Defendants' RICO counterclaim and ordered Defendants to show their Rule 11 basis for pleading that claim. Defendants ignored the Court's order, tacitly conceding the lack of a good faith basis for their claim. Nevertheless, over the following eight months, Defendants attempted to plead and replead these same facts as a claim under the Sherman Act without pleading the basic threshold requirement of WickFire's market share. Following the Court's dismisal and its Order that TriMax could not re-plead again, TriMax attempted to repackage these same factual allegations as a Texas state law tort claim for tortious interference. TriMax's newest legal theory is no better than its earlier ones. As this case approaches trial, WickFire respectfully requests that the Court narrow the claims and issues in this case by granting summary judgment as to TriMax's counterclaims.

## STANDARD OF REVIEW

Rule 56 authorizes summary judgment against a party who fails to make a sufficient showing of the existence of an element essential to that party's case and on which that party bears the burden at trial.[9] The movant bears the initial burden of "informing the Court of the basis of its motion" and identifying those portions of the record "which it believes demonstrate the absence

---

[8]    Notwithstanding the multi-year lifespan of this case, new evidence of TriMax's misconduct continues to emerge. For instance, in opposing WickFire's third-party subpoena to Google, counsel for TriMax filed a "John Doe" motion to quash, in which counsel for TriMax repeatedly represented to the Court that John Doe was a non-party to this case. Google's subpoena results revealed three TriMax accounts and five fake accounts in the names of WickFire's founders. (A. 47.) Counsel for TriMax's representation that John Doe was a non-party was false.

[9]    *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

of a genuine issue of material fact."[10]  The burden then shifts to the non-movant to "go beyond the

pleadings and designate specific facts showing that there is a genuine issue for trial."[11]  This burden

is not satisfied "with some metaphysical doubt as to the material facts, by conclusory allegations,

by unsubstantiated assertions, or by only a scintilla of evidence."[12] "A fact is material only if its

resolution would affect the outcome of the action . . . and an issue is genuine only 'if the evidence

is sufficient for a reasonable jury to return a verdict for the [nonmovant].'"[13]

## ARGUMENT

**A.    TRIMAX'S CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS
RELATIONS FAILS BECAUSE WICKFIRE'S BIDDING WAS LEGITIMATE COMPETITION
AND TRIMAX DID NOT LOSE ANY REASONABLY CERTAIN CONTRACTS AS A RESULT OF
WICKFIRE'S COMPETITION.**

As the Texas Supreme Court has explained, a plaintiff asserting tortious interference with

prospective business relations must prove (1) the defendant committed an independently tortious

or wrongful act, and (2) that the act interfered with a reasonably probable contract that would have

been entered into but for the interference.[14]  Despite years of discovery, TriMax cannot identify a

genuine issue of material fact as to either element.

### 1.    Bidding Against a Competitor is not Tortious.

TriMax's tortious interference claim is based on "predatory bidding," which is simply

TriMax's pejorative label for WickFire competing with TriMax in Google's AdWords auction.

"[T]o establish liability for interference with a prospective contractual or business relation the

plaintiff must prove that [the defendant's conduct] was either independently tortious or

---

[10]   *Celotex*, 477 U.S. at 323.

[11]   *Stults v. Conoco, Inc*., 76 F.3d 651, 656 (5th Cir. 1996).

[12]   *Little*, 37 F.3d at 1075; *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).

[13]   *Wiley v. State Farm Fire and Cas. Co*., 585 F.3d 206, 210 (5th Cir. 2009).

[14]   *Coinmach Corp. v. Aspenwood Apt. Corp*., 417 S.W.3d 909, 924 (Tex. 2013).

unlawful."[15]  TriMax's claim for tortious interference fails because bidding against a competitor in an auction marketplace is not tortious or unlawful.  TriMax has never pointed to an actual law that WickFire's bidding violates.  It cannot.  TriMax's claim is based on its subjective belief that WickFire's legitimate bidding in Google AdWords auctions was tortious because it decreased a competitor's profitability.  This is competition, not tortious interference.  There is no legal basis for claiming that a tort claim based on these facts exists or could ever exist.  If it did, courts would be put in the impossible position of overseeing litigation between competitors over every auction bid in Google AdWords.  This alone is grounds to grant summary judgment to WickFire.

Rather than admitting this fundamental defect in TriMax's tortious interference claim, TriMax appears to be basing its claim on an alleged violation of Google's AdWords policies.  Even if a violation occurred (and it did not), a violation of a Google AdWords policy does not create a cause of action under which a competitor can sue another competitor for tortious interference.[16] There is no precedent whatsoever for establishing a new tort under Texas law for the violation of a Google AdWords policy.  Finally, the only evidence that exists regarding Google's policies shows unequivocally that Google itself concluded that WickFire's bidding does not violate Google's policies.  TriMax raised this very issue with Google prior to the litigation and Google determined that WickFire's bidding constituted competition and did ***not*** violate any of its policies.[17]  TriMax's baseless belief that WickFire's conduct violates a Google policy, particularly

---

[15]  *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 713 (Tex. 2001).

[16]  *Bradford v. Vento*, 48 S.W.3d 749, 758 (Tex. 2001) (reversing a jury funding of tortious interference where "the interference was at most only an incidental result of [the defendant's] legitimate conduct.").  *See also ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 431 (Tex. 1997).

[17]  *See* A. 39 ("it appears that the account ***is not doing anything against our policies***.  Our policies cover a wide range of violations, but our team believes this falls under competition.").  TriMax claims that Google has since changed its policy and argues without any support that WickFire has violated a new Google policy.  (A. 275-6.) Even if a violation of a Google policy could support a claim for tortious interference under Texas law (which it cannot), TriMax still cannot point to any evidence that Google considers WickFire's bidding a violation.  The policy in question prevents advertising the same or similar content from multiple accounts for the same or similar search queries.  (*Id.*)  WickFire's coupon site is unique content and is perfectly in line with Google's policies.

11

given Google's express determination otherwise, does not raise a genuine issue of material fact.

> ### 2. *TriMax Has Not Identified a Single Contract that TriMax Would Have Entered into with Reasonable Probability Absent Competition from WickFire.*

To establish a cause of action for tortious interference with prospective business relationships, a plaintiff must show that there was a reasonable probability that the parties would have entered into a business relationship but for the alleged interference.[18] This requires a showing "that more than mere negotiations occurred."[19] TriMax's tortious interference claim seeks damages based on the fiction that TriMax would have grown at an unprecedented rate if not for competition from WickFire. But TriMax has not identified a single merchant that it would have actually contracted with absent WickFire's conduct. TriMax's unfounded belief that it was entitled to hundreds of contracts with unidentified merchants is not reasonably probable and cannot support a tortious interference claim.

> ### 3. *The Alleged Defamation Did Not Result in the Loss of Any Contracts.*

Finally, TriMax has alleges that its tortious interference claims are based on defamation stemming from WickFire's accusations that TriMax committed click fraud and ran fake advertisements for TheCoupon.Co. To form the basis for a tortious interference claim, the allegedly defamatory statement must interfere with a reasonably probable contract that would have been entered into but for the interference. None of the recipients of the allegedly defamatory statements terminated their business relationships with TriMax after receiving the alleged

---

[18] *Richardson-Eagle, Inc. v. William M. Mercer, Inc.*, 213 S.W.3d 469, 475 (Tex. App.—Houston [1st Dist.] 2006).

[19] *Id.*

defamatory statements.[20]  Thus, defamation cannot support a claim for tortious interference.[21]

**B.     TRIMAX'S CLAIM FOR TORTIOUS INTERFERENCE WITH EXISTING BUSINESS RELATIONS DOES NOT RAISE A GENUINE ISSUE OF MATERIAL FACT BECAUSE WICKFIRE'S CONDUCT WAS NOT UNLAWFUL.**

In order to prevail on its claim against all Defendants for tortious interference with an existing business relationship, Plaintiff must prove that a Defendant took (1) unlawful actions without justification or excuse (2) with intent to harm, causing (3) actual damages and (4) the actions were motivated by malice.[22]

> *1.     TriMax's Has Not Established An Independent Tort To Support Its Claim for Tortious Interference With Existing Contracts.*

The first element of Plaintiff's claim for tortious interference with an existing business relationship (unlawful action), mirrors the third element of a claim for tortious interference with a prospective business relationship (independently tortious or unlawful conduct). For both claims, Plaintiff must "prove that the defendant's conduct would be actionable under a recognized tort."[23] Again, TriMax has not established independently tortious conduct upon which to base this claim. The only action that TriMax complains about is WickFire's bidding in the AdWords auction, which is not tortious or unlawful.  WickFire has no legal duty to stop competing with TriMax because its competition decreases TriMax's profits.  Whenever a new bidder participates in an auction, this will always increase the expected costs of the other participants.  Although WickFire's

---

[20]   Freshology terminated its business relationship with TriMax in October 2012. (Dkt. 164 at ¶10.3.) Yet the alleged defamatory email that TriMax relies on was sent afterwards on December 5, 2012. (*Id*. at ¶23.1.)  Accordingly, given that the termination could not have been based on the alleged defamatory statement, no evidence exists to support TriMax's claim that alleged defamatory statements interfered with Freshology.

[21]   Additionally, TriMax's defamation claims cannot be maintained because TriMax failed to request a statutorily-required retraction under Texas's Defamation Mitigation Act, Tex. Civ. Prac. & Rem. Code §§ 73.052–062.

[22]   *McGowan & Co. v. Bogan*, 93 F. Supp. 3d 624, 655 (S.D. Tex. 2015).  *See also Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 207 (Tex. 2002).

[23]   *Wal-Mart Stores*, 52 S.W.3d at 726.

13

bidding may increase TriMax's costs when the two companies bid in direct competition with each other, that does not permit TriMax to sue for "lost profits" for campaigns that it voluntarily suspended because competition from WickFire had rendered them less profitable.  There is an easy solution to TriMax's problem that does not require any judicial oversight.  If TriMax is paying more than it wants to, TriMax can just bid less.  Instead, TriMax asks the Court to remove a competitor from the marketplace—simply because competition has rendered TriMax less profitable.

> **2.**     *TriMax's Miscellaneous Other Allegations Do Not Salvage*
> *Its Tortious Interference Claim.*

It is unclear whether TriMax still intends to pursue many of the facts it alleged in its many pleadings.  However, to the extent that any of these remain live issues in this case, WickFire will address them briefly.  In its five attempts to plead a Sherman Act claim, TriMax attempted to label WickFire's revenue sharing agreement with a contractor as a "kickback" to make it sound more salacious.  TriMax has only identified two specific merchants who terminated their business relationships with TriMax in order to work with WickFire: eFoodsDirect and Freshology.  Freshology terminated TriMax before the revenue sharing agreement even existed.  And when TriMax deposed the CEO of FiveCentShine, he testified that his referral commission for eFoodsDirect had been disclosed to the merchant. (A. 280.)   TriMax also subpoenaed eFoodsDirect and Freshology.  No evidence suggests that the referral commissions WickFire paid to FiveCentShine were not disclosed to the merchants.  As such, TriMax has not identified any unlawful action taken by WickFire that would permit a tortious interference claim based on these terminations.  Thus, TriMax's tortious interference claims should be dismissed.

Finally, TriMax's expert claims that WickFire clicked on TriMax's ads.  TriMax has produced no evidence of (1) malice or (2) any actual harm to its business associated with those

clicks, as its only damages are associated with lost profits from campaigns that it voluntarily suspended in light of competition from WickFire.  To demonstrate click fraud, TriMax must show that it was actually charged by Google for any such ad and show that the amount had an actual impact on its business.[24]  It has not, and discovery is now closed.  Thus, a claim for tortious interference fails on that basis.

## C.     TriMax and Woodruff Are Barred from Asserting Claims For Defamation and Business Disparagement Because They Did Not Request a Retraction Pursuant to Texas's Defamation Mitigation Act.

TriMax and Woodruff have both asserted claims for defamation and business disparagement against WickFire, Hall, and Brown under Texas state law.  WickFire respectfully requests that the Court grant summary judgment as to these claims as well.

### 1.     The Defamation and Business Disparagement Counterclaims are Barred Because TriMax and Woodruff Did Not Comply With Texas's Defamation Mitigation Act.

Neither TriMax nor Woodruff is permitted to maintain a defamation or business disparagement claim because they did not meet the statutory requirement of requesting a retraction under Texas's Defamation Mitigation Act, Tex. Civ. Prac. & Rem. Code Ann. §§ 73.052–062. The Act allows a party to bring an action *only* if the person has made a timely request for correction, clarification, or retraction from the defendant. *Id.* § 73.055(a).  The request for correction must be made within the limitations period for a defamation action, which is one year. *Id.* § 73.055(b).  Neither TriMax nor Woodruff has ever requested a retraction from WickFire, Hall, or Brown.  As Judge Pitman recently concluded in addressing this same issue, the failure to

---

[24]   *See McGowan*, 93 F. Supp. 3d at 655; *Peterson v. Dean Witter Reynolds, Inc.*, 805 S.W.2d 541 (Tex. App.— Dallas 1991, no pet.) (affirming directed verdict where the plaintiff failed to establish actual damages).

request a retraction results in a bar to suit.[25]  Dismissal of TriMax and Woodruff's defamation and

business disparagement claims is appropriate on this basis.

> 2. *TriMax and Woodruff's Defamation Claims Also Fail Because WickFire's Statements Were Truthful and Did Not Damage TriMax.*

In order to prevail on a defamation claim, TriMax must show that the person publishing

the allegedly defamatory statement knew or should have known that the statement was false.[26]

TriMax's defamation claim rests on WickFire's accusations that TriMax committed click fraud

and ran fake ads that directed to TheCoupon.Co.  But there is no evidence that Mr. Hall or Mr.

Brown knew or should have known that these statements were false.  In fact, WickFire's founders

reasonably believed their accusations to be true, an absolute defense to a claim for defamation.[27]

As discussed below, Google's records demonstrate that TriMax's IP address accessed two fake

AdWords accounts in Mr. Brown's name and third party records produced by Verizon identify

TriMax as committing click fraud.  (A. 64-74; 97-98; 321-324.)  TriMax *now* claims that the

Verizon device traced to these clicks was not in TriMax's possession at the time.  But before the

Verizon subpoena results were produced, TriMax claimed that it had possession of all devices that

utilized the Verizon account and would make them available for inspection.  (A. 326.)  Moreover,

third-party testimony from two of Woodruff's ex-contractors describe Woodruff explaining how

to commit click fraud and participating in committing click fraud as a business tactic, and testified

that she used click fraud against their AdWords accounts after their business relationship ended.[28]

---

[25] *See Hammond v. Uriegas*, No. 5:15-CV-00579-RP (W.D. Tex. Dec. 29, 2016) (Pitman, J.) ("The TDMA prohibits maintenance of an action if such a correction, clarification, or retraction is not requested within one year.") (attached as Exhibit 1).

[26] *Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex. 1976), *cert. denied*, 429 U.S. 1123, 51 L. Ed. 2d 573, 97 S. Ct. 1160 (1977).

[27] *See Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995).

[28] A. 291-293; 310-313.  TriMax neglects to inform the Court that the former contractor who pleaded the fifth in her deposition did so ***when asked expressly about Woodruff instructing her to commit click fraud***.  (A. 303.)

TriMax and Woodruff have not created a genuine issue of material fact as to falsity.

Moreover, TriMax may not recover either exemplary damages or attorneys' fees without a finding of actual malice, for which there is no factual support. "Actual malice is a term of art, focusing on the defamation defendant's attitude toward the truth of what it reported."[29] Malice cannot be established unless the defendant acted "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not."[30] There is no basis upon which a jury could conclude that WickFire's founders made defamatory statements about TriMax or Woodruff with knowledge of or reckless disregard as to the falsity of those statements.

> 3. *TriMax and Woodruff's Claims for Business Disparagement Fail Because WickFire's Statements Were Truthful, Not Malicious, and Did Not Cause Damages.*

TriMax and Woodruff's business disparagement claim also fail because there is no genuine issue of material fact on two essential elements. A business disparagement claim requires: (1) publication of disparaging words by defendant, (2) falsity, (3) malice, (4) lack of privilege, and (5) special damages.[31] Here, there is no genuine issue of material fact on either falsity, malice, or special damages. Malice is an "essential element" of a business disparagement claim, and an absence of malice warrants dismissal on summary judgment.[32] Moreover, showing the substantial truth of a publication negates the essential element of falsity."[33] Finally, TriMax and Woodruff have not demonstrated special damages. TriMax has not pointed to a single business relationship

---

[29] *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 573-74 (Tex. 1998) (holding that summary judgment is proper under Texas law if a defendant can negate actual malice as a matter of law).

[30] *Id.*

[31] *Kinetic Concepts, Inc. v. Bluesky Med. Corp.*, No. SA-03-CA-0832-RF, 2005 U.S. Dist. LEXIS 32213, at *5 (W.D. Tex. 2005).

[32] *Id.*

[33] *See Granada Biosciences, Inc. v. Forbes, Inc.,* 49 S.W.3d 610, 616 (Tex. App.—Houston [14th Dist.] 2001) *(citing McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990)).

that was terminated as a result of any of WickFire's statements and its revenues have only grown since 2013.  Here, dismissal is appropriate on either basis.

**D.    THERE IS NO BASIS FOR SUBJECTING MR. HALL OR MR. BROWN TO INDIVIDUAL LIABILITY UNDER TRIMAX AND WOODRUFF'S THIRD PARTY CLAIMS.**

Finally, TriMax and Defendant Woodruff have filed third party claims for defamation, business disparagement, and tortious interference against Mr. Hall and Mr. Brown, WickFire's two founders, individually.  But the conduct they complain about was done on behalf of WickFire and cannot subject Mr. Hall and Mr. Brown to individual liability.  "A corporate officer's acts on the corporation's behalf are deemed corporate acts."[34]  The officer's potential personal gain is not determinative, nor do mixed motives—to benefit himself and for the corporation to benefit—establish liability.[35]  Instead, TriMax must show that the officer acted in a manner so contrary to the corporation's best interests that his or her actions could only have been motivated by personal interest.[36]  TriMax has not done so here.  The conduct at issue—WickFire's bidding and complaints about TriMax's click fraud—benefitted WickFire, not Mr. Hall or Mr. Brown individually.

**E.    SUMMARY JUDGMENT IS APPROPRIATE ON WICKFIRE'S LANHAM ACT CLAIM BECAUSE TRIMAX CREATED AND USED FAKE ADWORDS ACCOUNTS TO FRAME WICKFIRE FOR TRADEMARK VIOLATIONS.**

Finally, WickFire requests that the Court grant summary judgment against TriMax for WickFire's affirmative claim under Section 43(a) of the Lanham Act.  Under Section 43(a) of the Lanham Act, it is illegal to falsely represent the origin of a good or service in commerce.[37]  To prevail on a claim under Section 43(a), a plaintiff must prove that the defendant falsely represented

---

[34]  *See Holloway v. Skinner*, 898 S.W.2d 793, 795 (Tex.  1995); *ACS Investors v. McLaughlin*, 943 S.W.2d 426, 432 (Tex. 1997).

[35]  *Holloway*, 898 S.W.2d at 796.

[36]  *Id*.

[37]  15 U.S.C. § 1125(a)(1); *Alum-A-Fold Shutter Corp. v. Folding Shutter Corp.*, 441 F.2d 556, 557 (5th Cir. 1971).

the origin of goods or services in commerce.  TriMax's fake ads that linked to WickFire's

TheCoupon.Co website are a textbook example of a violation of Section 43(a).  These fake ads

make it appear that TheCoupon.co has violated the trademarks of well-known brands like

Walgreens, Verizon Wireless, and others.  Additionally, the fake ads used WickFire's affiliate

tracking IDs, a unique identifier used by affiliate networks and third party compliance monitors to

track commissions and monitor trademark violations.  (A. 5.)  WickFire has demonstrated that the

fake ads were likely to cause confusion, mistake, or to deceive another person as to the origin of

the ads by producing more than fifty termination notices sent to WickFire based on these fake ads.

TriMax has never disputed that the fake advertisements falsely represented designated

WickFire as their source by including references to WickFire's TheCoupon.co website and

WickFire-specific identification numbers.  There is no dispute as to whether this activity

constitutes a violation of Section 43(a) of the Lanham Act.  TriMax claims only that it did not

place these fake advertisements.  No reasonable jury could conclude that TriMax did not place

these advertisements.  Google's business records documented every IP address that accessed the

fake AdWords accounts used to create and place the fake ads.  TriMax's IP address, which operates

out of a private server in Defendant Woodruff's home, accessed two of the fake AdWords

accounts.  (A. 64-74; 97-98.)  An internet connection belonging to Defendant Woodruff's mother

also appears hundreds of times in the fake accounts.  (A. 164-220.)  Moreover, the fake AdWords

accounts were funded using American Express prepaid credit cards that were purchased (1) at a

CVS Pharmacy within 1 mile of Defendant Woodruff's house, (2) at two Walgreens locations in

Lubbock, Texas, where Defendant West lived at the time, and (3) at a Wal-Mart in Longview,

Texas, within 5 miles of Defendant Woodruff's mother's address.  (A. 225-264.)  Another

American Express card used to fund one of the fake accounts was used in September 2015 to make

a purchase in Early, Texas, a tiny town with a population of about 2,800 people.  Early, Texas is

twelve miles from Defendant West's current home.  (A. 265, 334.)  Discovery in this case leaves no genuine issue of material fact as to whether TriMax placed the fake ads.

TriMax has attempted to avoid liability on this claim in two ways.  First, it hired an expert, Dr. Michael Shamos, to state that TriMax was not responsible for the fake ads.  Dr. Shamos concluded that "[o]nly a single IP address, 12.177.112.66, is owned by TriMax. . . this IP address was never used to access a Concealed AdWords Account." (A. 22.)  But counsel for TriMax did not provide Dr. Shamos with the documentation for the 151 account, which was accessed by TriMax's static IP address.  (A. 22.)  Counsel for TriMax cannot purposely withhold incriminating documents from its expert and then rely on his incorrect conclusion (based on his lack of access to those documents) to defeat summary judgment.

Second, Defendant Woodruff has denied under oath that she created the fake accounts.  To be sure, Woodruff has repeatedly made such denials under oath in discovery responses, depositions, and sworn affidavits.  "Defense of a proper summary judgment motion requires more than a mere denial."[38]  Rather, the party opposed to the motion "is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact."[39]  Defendants simply cannot do so.  The clear, undisputed evidence is that TriMax placed the fake ads and violated Section 43(a) of the Lanham Act.  Therefore, WickFire respectfully requests that the Court grant summary judgment in WickFire's favor.

---

[38]  *Union Planters Nat'l Leasing, Inc. v. Woods*, 687 F.2d 117, 119 (5th Cir. 1982); *Bros, Inc. v. W. E. Grace Manufacturing Co*., 261 F.2d 428, 433 (5th Cir. 1968) (if "no real genuine controversy on the decisive fact exists, a mere formal denial is but a pretended one, and is insufficient. . . . These mutual principles assure both the fullest utility to this procedural device while keeping it from ever becoming a mere wager of affidavits, a compurgation by the most paper swearers").

[39]  *Union Planters,* 687 F.2d at 119.  *See also Ferguson v. NBC*, 584 F.2d 111, 114 (5th Cir. 1978) ("once the moving party has properly supported his summary judgment motion, the nonmoving party must rebut with 'significant probative' evidence").

## CONCLUSION

TriMax and Woodruff failed to raise a triable issue of material fact to withstand summary judgment on any counterclaims.  Moreover, no reasonable jury could rule in favor of TriMax on WickFire's Lanham Act claim.  As such, WickFire respectfully requests that the Court grant WickFire's motion for summary judgment and award any other relief the Court deems appropriate.

Dated: July 15, 2016

Respectfully submitted,

**ATLAS LAW PLLC**

*/s/ Katharine M. Atlas*

Katharine M. Atlas
Texas Bar No. 24080777
2525 Robinhood Street
Houston, Texas 77005
Telephone: (713) 561-5544
Facsimile: (832) 201-9874
katlas@atlastriallaw.com

**DYKEMA COX SMITH**

Bradley Coburn
Texas Bar No. 24036377
BCoburn@dykema.com
Mary Schaerdel Dietz
mdietz@dykema.com
State Bar No. 03741500
111 Congress Avenue, Suite 1800
Austin, Texas 78701
Telephone: (512) 703-6300
Facsimile: (512) 703-6399

*Attorneys for Plaintiff WickFire LLC and*
*Third-Party Defendants Chet Hall and Jon Brown*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2016, a true and correct copy of the foregoing document was filed electronically using the Court's electronic filing system.  Parties may access this filing through the court's CM/ECF system.

*/s/ Katharine M. Atlas*
Katharine M. Atlas