FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**   2017 MAR 23   AM 11: 26
**AUSTIN DIVISION**

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____

WICKFIRE, LLC,
                    **Plaintiff,**

-vs-                                                        **CAUSE NO.:**
                                                           **A-14-CA-00034-SS**

LAURA WOODRUFF, WREI, INC.,
JOSH WEST, and TRIMAX MEDIA,
LLC,
                    **Defendants.**

## O R D E R

BE IT REMEMBERED on this day the Court reviewed the file in the above-styled cause, and specifically Plaintiff Wickfire, LLC's Motion for Entry of Final Judgment [#363], Defendants TriMax Media, LLC, WREI, Inc., Josh West, and Laura Woodruff's Response [#367] in opposition, and Wickfire's Reply [#369] in support, as well as Defendants' Motion for Judgment as a Matter of Law [#364], Wickfire's Response [#368] in opposition, and Defendants' Reply [#370] in support.[1] Having reviewed the documents, the governing law, and the file as a whole, the Court now enters the following opinion and orders.

### Background

Plaintiff Wickfire and Defendant TriMax are both advertisers competing in the pay-for-performance search engine marketing business. As recounted in the Court's Order of March 25, 2016, merchants in the search engine marketing business partner with advertisers like Wickfire and TriMax, often through agencies (known as affiliate networks) who manage the merchants' advertising needs. *See* Order of Mar. 25, 2016 [#198]. Those advertisers then generate ad

---

[1] The Court also considered Wickfire's Unopposed Motion to Dismiss [#344] its claims for business disparagement, defamation, and misappropriation with prejudice, which the Court hereby GRANTS.

campaigns and pay search engines a fee to place their ads alongside certain search terms. The advertisers earn money only to the extent their ads are effective in driving customer traffic.

A Google AdWords auction is the platform through which an advertiser pays Google to place their ads alongside search terms. Advertisers like Wickfire and TriMax bid on keywords associated with search terms, so when a customer enters the search terms, the advertiser's ad appears. A new auction is conducted instantly each time a search query is entered. Each advertiser must specify the highest cost-per-click price it is willing to pay, and Google considers that price ceiling in determining which ad will be the winning ad. In addition to specifying the maximum cost-per-click it is willing to pay, an advertiser must submit a "budget" identifying the maximum amount it is willing to pay Google to display an ad. When this budget is exhausted, the advertiser's ad campaign is "paused," meaning the ad no longer appears alongside the selected search terms.

In this case, each party claims the other fraudulently interfered with its business. Wickfire has sued TriMax Media, LLC, Laura Woodruff, TriMax's owner and CEO, WREI, Inc., and Josh West, TriMax's Director of Business Development and WREI's CEO (collectively, Defendants), alleging Defendants (1) placed fraudulent advertisements on Google AdWords that falsely designated Wickfire as their origin in violation of the Lanham Act, and (2) engaged in "click fraud"[2] and placed fraudulent advertisements to intentionally interfere with Wickfire's current and prospective contractual and business relationships, and they did so as part of a conspiracy to harm Wickfire. Wickfire contends these fraudulent ads misidentified Wickfire as the source of

---

[2] Although the witnesses at trial testified to varying definitions of "click fraud," the parties use the term in their claims to mean the practice where an individual clicks on a competitor's ad to drive up the competitor's cost of advertising and prematurely exhaust the budget. Once a competitor's ads disappeared, the individual committing click fraud can then win the bid.

the ad by (1) including a tracking identifier uniquely assigned to Wickfire[3] and directly linking to a merchant's website, or (2) linking to Wickfire's website TheCoupon.co, which contains individual webpages for each merchant. Such fraudulent advertisements, Wickfire argues, violated trademark laws and therefore breached the terms of its contracts with merchants and affiliate networks.

TriMax, for its part, has counterclaimed against Wickfire and brought third-party claims against Chet Hall and Jon Brown, co-founders of Wickfire (collectively, Counter-Defendants), alleging Counter-Defendants employed a computer program called WebCrawler to manipulate the Google AdWords auction. According to TriMax, this forced TriMax to pay higher costs for a winning ad and prevented TriMax from promoting its merchants, all in violation of Texas laws prohibiting intentional interference with existing and prospective business relationships.[4] TriMax also alleges Counter-Defendants engaged in "click fraud" and disparaged TriMax throughout the industry. Both TriMax and Woodruff sued Counter-Defendants for defamation.

A jury trial was held from January 30, 2017, to February 2, 2017. The jury returned a unanimous verdict in favor of Wickfire, finding Defendants TriMax, Laura Woodruff, WREI, and Josh West (1) misrepresented Wickfire as the source of advertisements by placing

---

[3] Advertisers like Wickfire and TriMax are assigned a unique tracking identifier, which is embedded in the advertisement. When a merchant sale occurs through an advertisement run by Wickfire or TriMax, the merchant uses the unique tracking identifier to determine which advertiser it owes a commission.

[4] Specifically, TriMax claims Wickfire manipulated the Google AdWords auction by engaging in "predatory bidding." Wickfire allegedly did this by (1) running indirect ads below TriMax's direct ads that linked customers to a website called WebCrawler.com (eventually Wickfire would begin linking these indirect ads to its own website, TheCoupon.co, rather than WebCrawler.com), (2) "plac[ing] exorbitantly high bids on its Webcrawler ads" which caused TriMax's cost-per-click to "skyrocket," and (3) once TriMax's budget was exhausted and its ad campaign paused, Wickfire placed its own direct ads "which easily won the auctions due to the lack of competition from TriMax." *See* Resp. [#246] at 10. Additionally, in support of its unclean hands defense, TriMax claims Wickfire used tracking identifiers similar to those used by TriMax to make it look like TriMax, not Wickfire, was the predatory bidder.

According to Wickfire, TriMax's increased costs resulted from its own overbidding, not tortious interference from Wickfire. As Wickfire explains, TriMax alone controls its bids; TriMax has never been charged more than it bid, and this bidding strategy was equally open to TriMax. Wickfire therefore maintains this so-called practice of "predatory bidding" simply constitutes legitimate competition.

advertisements containing identifying information distinctive of Wickfire in a manner that was likely to cause confusion; (2) intentionally interfered with Wickfire's existing contracts; (3) tortiously interfered with Wickfire's prospective business relationships; (4) were part of a conspiracy that damaged Wickfire; and (5) acted with malice or gross negligence. The jury awarded Wickfire $2,318,000.00 in compensatory damages as a result of Defendants' intentional interference with Wickfire's existing contracts and prospective business relationships. The jury attributed 95% of the responsibility to Laura Woodruff and 5% of the responsibility to Josh West.

The jury also found Counter-Defendants intentionally interfered with TriMax and Laura Woodruff's existing contracts, but concluded they had a colorable right to do so. The jury further found Counter-Defendants were not liable for TriMax's remaining counterclaims of intentional interference with prospective business relationships, business disparagement, and defamation. As a result, the jury unanimously found TriMax and Laura Woodruff should take nothing on their counterclaims and third-party claims.

Defendants promptly filed their renewed motion for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, in the alternative, a new trial under Federal Rule of Civil Procedure 59, arguing the evidence presented at trial was legally insufficient to support the jury's verdict. *See* Renewed Mot. J. Matter Law [#364]. Wickfire cross-moved for entry of judgment. *See* Mot. Entry J. [#363]. These motions have been fully briefed and are now ripe for the Court's consideration.

## Analysis

### I.     Renewed Rule 50(b) Motion

### A.     Legal Standard

When ruling on a Rule 50(b) motion for judgment as a matter of law, "[a] jury verdict must stand unless there is a lack of substantial evidence, in the light most favorable to the successful party, to support the verdict." *Am. Home Assurance Co. v. United Space All., LLC*, 378 F.3d 482, 487 (5th Cir. 2004). Accordingly, the question for this Court "is whether the state of proof is such that reasonable and impartial minds could reach the conclusion the jury expressed in its verdict." *Id.* (internal quotation marks omitted); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe.").

Generally, a renewed Rule 50(b) motion is filed after a judgment is entered. *See* FED. R. CIV. P. 50(b). However, the motion is still timely even if it is filed before the judgment is entered, because Rule 50(b) sets only the outer filing limits. *See Gaia Technologies Inc. v. Recycled Prods. Corp.*, 175 F.3d 365, 374 (5th Cir. 1999) ("Although Rule 50(b) permits a party to renew its motion as late as ten days after the judgment is entered, it does not proscribe filing a renewed motion before judgment is entered.").

### B.     Application

Defendants argue they are entitled to judgment as a matter of law on Wickfire's claims of intentional interference with existing contracts, tortious interference with prospective business relationships, civil conspiracy, and false designation in violation of the Lanham Act. As explained below, the Court denies Defendants' renewed motion for judgment as a matter of law on each ground.

i.    **Intentional Interference with Wickfire's Existing Contracts**

To prove a claim for intentional interference with existing contracts under Texas law, a plaintiff must establish (1) the existence of a contract; (2) intentional interference; (3) the interference was a proximate cause of the plaintiff's damages; and (4) actual damages. *See Powell Indus. Inc. v. Allen*, 985 S.W.2d 455, 456 (Tex. 1998). Defendants contend the evidence presented at trial was insufficient to support the jury's finding of the existence of a contract and its award of damages.

As to Defendants' challenge to the existence of a contract, the Court finds Wickfire offered evidence regarding its merchant and affiliate network contracts and their corresponding terms and conditions. Afternoon of Jan. 30, 2017 Tr. at 45:25–46:24; Pl.'s Exs. [#361-6] Ex. 122 (Commission Junction Contract); *id.* [#361-7] Ex. 126 (Rakuten Marketing LLC Contract) at 15–53; *id.* [#361-8] Ex. 127 (Sharesale.com, Inc. Contract) at 1–6. Each affiliate contract contains a specific provision which prohibited advertisers from infringing on merchant trademarks. For instance, Section 8.7 of Wickfire's Rakuten Marketing LLC contract provides, "You may not use any name, trademark, service mark, domain name, or other Intellectual Property Rights of any third party . . . in any way or for any purpose that infringes or violates any Intellectual Property Rights or other rights of such third party[.]" Rakuten Marketing LLC Contract at 28. Wickfire's contracts with other major affiliate networks include similar provisions. *See, e.g.*, Commission Junction Contract at 6;  Pl.'s Exs. [#361-7] Ex. 125 (eBay Enterprise, Inc. Contract) at 1–14; Sharesale.com, Inc. Contract at 5. Wickfire identified dozens of merchants covered by its major affiliate contracts. Pl.'s Exs. [#361-4] Ex. 104 (Merchant Violation Notices) at 587–91. Moreover, Hall testified that an affiliate contract may cover hundreds or thousands of individual merchant relationships. Afternoon of Jan. 30, 2017 Tr. at 46:21–24. Notwithstanding Defendants' assertions to the contrary, Wickfire presented evidence of the specific contracts and

6

particular provisions that support an inference Defendants intentionally interfered with existing contracts.

Similarly, there is sufficient evidence in the record to support the jury's finding that Defendants' conduct proximately caused Wickfire damage in the amount of $1,984,000.00.[5] Wickfire based its lost profits analysis on its inability to produce direct advertising campaigns as it had historically done under its existing contractual relationships with affiliate networks. At trial, Hall testified its affiliate contracts serve as "the lifeblood" of Wickfire's advertising business. Afternoon of Jan. 30, 2017 Tr. at 46:24. Jared Jordan, Wickfire's damages expert, testified, "there's no doubt based on the historical information and what's happening in the market that [but for the impersonating ads] Wickfire's . . . net advertising campaigns would have continued to grow" in accordance with the damages claimed. Afternoon of Jan. 31, 2017 Tr. at 91:3–6. The jury heard evidence that the only reason it was unable to generate this established trajectory of businesses was because of the time and resources Wickfire had to redirect toward combatting Defendants' impersonating ads. According to Hall, had Wickfire not focused on defending against the impersonating ads, it risked losing "a third of [its] business overnight" from just one of its affiliate networks. Afternoon of Jan. 30, 2017 Tr. at 46:21–23. Jordan further

---

[5] Wickfire also argues Defendants' waived their challenge to the issues of proximate cause or damages because they failed to raise a specific challenge to these issues in their oral Rule 50(a) motion. After the close of Wickfire's case-in-chief, Defendants' counsel stated, "I'd further move based on tortious interference with contract, the failure to provide evidence to support the elements—this is tortious interference with existing contracts." Afternoon of Jan. 31, 2017 Tr. at 114:24–115:5. According to Wickfire, this generic challenge to all of the elements of intentional interference is insufficient to put either Wickfire or the Court on notice of Defendants' challenge. However, Defendants moved under Rule 50 on all questions of liability, and "[a]ll forms of damages were inherent in [the] request" for judgment. *Logan v. Burgers Ozark Country Hams Inc.*, 263 F.3d 447, 457 (5th Cir. 2001). Indeed, the Fifth Circuit has expressly "decline[d] to adopt an unduly burdensome view of Rule 50 that would require litigants to detail every aspect of a case where, as in this case, a general, all-encompassing statement will suffice." *Id.*

Moreover, it is clear from a review of the record that the Court—which directly questioned Wickfire about its damage calculations—and Wickfire—which expressly argued why, in its view, the jury heard sufficient evidence of damages arising from intentional interference—were on notice of Defendants' challenge to damages.

testified that once the impersonating ads began, Wickfire "started losing campaigns at a rate of average of about seven per month." Afternoon of Jan. 31, 2017 Tr. at 91:7–12.

Contrary to Defendants' representation, Wickfire was not required to enumerate its lost profits for each individual merchant contract. *See Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 399–400 (5th Cir. 2013). In *Homoki*, a credit card processing software company sued its competitor for intentional interference with existing contracts. *Id.* at 394. The software company did not sell its products to merchants directly, but rather contracted with intermediary companies that connected the software company to merchants. *Id.* at 393–94. The Fifth Circuit concluded the software company produced sufficient evidence to support its lost profits analysis, which was based entirely on the business the software company would have generated from the underlying merchants via its contract with an intermediary company. *Id.* at 399–400. Notably, the Fifth Circuit did not require the software company to breakdown its lost profits analysis for each individual merchant contract. *See id.*

Like the software company in *Homoki*, Wickfire's intentional interference claim is premised on a company's interference with its intermediate, or affiliate, contracts. As in *Homoki*, Wickfire could establish its damages by basing its lost profits analysis on the business it would have generated from the underlying merchants. It was not required to enumerate its lost profits for each individual merchant contract.

Moreover, Wickfire's proposed damages were not conjured from thin air, but based on "objective facts, figures, [and] data from which the amount of lost profits can be ascertained." *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010). In establishing Wickfire's damages, Jordan relied on the same factors the founder of the software company in *Homoki* considered in calculating his damages: the company history, duration of merchant contracts in the industry, and the rate of increase in sales based on historical growth trends. 717

8

F.3d at 399–400. Wickfire was not required to produce tax records or other financial records to establish its lost profits. *Swinnea*, 318 S.W.3d at 876 (quoting *Holt Atherton Indus., Inc. v. Heine*, 935 S.W.2d 80, 84 (Tex. 1992)) ("Although supporting documents may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.").

In a final attempt to show the deficiency of evidence supporting Wickfire's lost profits analysis, Defendants contend "Texas law prohibits the finding of lost profits based on time lost from not focusing on one's business." Renewed Mot. J. Matter Law [#364] at 14. In support of this contention, Defendants relies solely on *Home Pro Constr. Co., Inc. v. Hoelscher Weatherstrip Mfg. Co., Inc.*, where the Southern District of Texas noted "expenses incurred in prosecuting or defending a suit are not recoverable as costs or damages unless recovery of those items is expressly provided by statute, is available under equitable principles, . . . or is expressly provided by contract." No. H-11-4440, 2013 WL 6491189, at *8 (S.D. Tex. Dec. 10, 2013) (quoting *Shenandoah Assocs. v. J & K Props., Inc.*, 741 S.W.2d 470, 486 (Tex. App.—Dallas 1987, writ denied)). However, Wickfire's damage request does not include its litigation expenses or costs, and *Home Pro Construction Company* does not address whether a party may recover profits lost from mitigating the business impacts of unlawful conduct. Defendants have therefore failed to convince the Court of *Home Pro Construction Company*'s applicability in the instant case.

Accordingly, based on the evidence presented at trial, it was reasonable for the jury to award $1,984,000.00 in damages caused by Defendants' intentional interference with Wickfire's existing contracts. Defendants' request for judgment as a matter of law on this ground is DENIED.

### ii.     Tortious Interference with Wickfire's Prospective Business Relationships

To prove a claim for tortious interference with prospective business relationships under Texas law, a plaintiff must establish (1) a reasonable probability the plaintiff would have entered into a business relationship; (2) an independently unlawful act; (3) the defendant acted with a desire to prevent the relationship from occurring or the defendant knew the interference was at least substantially certain to occur as a result of the conduct; and (4) the plaintiff suffered actual harm as a result. *Matter of Dall. Roadster, Ltd.*, 846 F.3d 112, 123–24 (5th Cir. 2017). Defendants contend the evidence presented at trial was insufficient to support the jury's finding of the existence of prospective relationships, an unlawful act, and damages.

In response to Defendants' challenge that Wickfire failed to identify any prospective relationships, Wickfire highlights several facts in support of its contention that it would have entered into merchant relationships vis-à-vis TheCoupon.co in early 2013. In 2012, before the click fraud began, Wickfire was developing TheCoupon.co to provide couponing services to merchants. Afternoon of Jan. 30, 2017 Tr. at 30:25–31:23. The jury heard evidence that Wickfire was attempting to expand its relationships with direct advertising merchants, so that its direct-search customers like Freshology and eFoodsDirects constituted prospective indirect-search customers for TheCoupon.co. *Id.* at 16:2–5; Defs.' Exs. [#361-21] Ex. 62 (Email from Chet Hall to Freshology Representative) at 1843 (discussing development of TheCoupon.co services for Freshology). The record further shows that many of Wickfire's customers for TheCoupon.co were, in fact, its existing customers who previously retained Wickfire's direct-search services. *See, e.g.*, Defs.' Exs. [#361-21] Ex. 57 at 59–1842. Given this evidence, the jury could have concluded there was a reasonable probability Wickfire would have provided TheCoupon.co services to its direct clients by March 2013 had it not been for Defendants' conduct.

Defendants also contend "Wickfire offered no evidence of an independently tortious or unlawful act[.]" Renewed Mot. J. Matter Law [#364] at 17. However, the jury heard evidence Defendants clicked on Wickfire's online advertisements for 12 to 14 hours a day over a period of months for the sole purpose of forcing Wickfire to pay for the clicks, and this clicking, which ultimately resulted in 4,080 clicks, could have run Wickfire out of business. *See* Afternoon of Jan. 30, 2017 Tr. at 34:18–35:2, 38:15–39:6; Morning of Jan. 31, 2017 at 57:9–24 (testimony from Dr. Bernard Jansen, Wickfire's expert). Moreover, Wickfire has provided sufficient support for the proposition that click fraud is unlawful. *See, e.g., FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1292 (11th Cir. 2011) (describing the "illicit practice[]" of click fraud where the clicking "result[s] in lower sales conversion rates for advertisers because the leads are false— they do not come from actual buyers interested in purchasing the advertised products"); *Menagerie Prods. v. Citysearch*, No. CV 08-4263 CAS, 2009 WL 3770668, at *19 (C.D. Cal. Nov. 9, 2009) (concluding click fraud could serve as the basis for a civil lawsuit against an online advertiser).

Defendants finally argue there is legally insufficient evidence supporting the jury's award of damages resulting from their allegedly tortious interference with prospective business relationships. However, Hall testified that Wickfire began developing TheCoupon.co in 2012 and would have launched this new advertising campaign had it not been for Defendants' click fraud. Afternoon of Jan. 30, 2017 Tr. at 30:25–31:23, 34:4–13. Hall further testified, "all that [he] did for months" during this time period was address the harms being caused by click fraud. *Id.* at 24:25–25:2. Hall's testimony provides a reasonable basis by which the jury could have concluded Defendants' actions precluded Wickfire from securing prospective business relationships with existing merchants.

Moreover, based on Hall's testimony, Jordan calculated Wickfire's lost profits for the six-month delay caused by the click fraud. Afternoon of Jan. 31, 2017 Tr. at 88:2–90:5. In his calculations, Jordan considered the resources Wickfire expended combatting click fraud in addition to the business and revenue TheCoupon.co eventually generated. *Id.* As explained above, the Court finds Jordan's lost profits analysis comports with Fifth Circuit precedent. *See supra Section* I.B.i. There was sufficient evidence presented at trial to support the jury's award of $334,000.00 in damages for tortious interference with prospective business relations. Defendants' motion for judgment as a matter of law on this ground is DENIED.

Alternatively, Defendants request "remittitur to reduce the damages amount and, if not accepted by Wickfire, a separate trial on damages." Renewed Mot. J. Matter Law [#364] at 16. A party's alternative request for remittitur, rather than a new trial, may be granted where the damage award was "merely excessive or so large as to appear contrary to right reason." *Brunnemann v. Terra Intern, Inc.*, 975 F.2d 175, 178 (5th Cir. 1992). "A verdict is excessive as a matter of law if shown to exceed 'any rational appraisal or estimate of the damages that could be based upon the evidence before the jury.'" *Brunnemann v. Terra Intern., Inc.*, 975 F.2d 175, 178 (5th Cir. 1992) (quoting *Kolb v. Goldring, Inc.*, 694 F.2d 869, 871 (1st Cir. 1982)). Based on the evidence presented at trial, the Court finds Wickfire's damages were not excessive as a matter of law and therefore Defendants' request for remittitur or a separate trial on damages is DENIED.

### iii.    Civil Conspiracy

To establish a civil conspiracy under Texas law, a plaintiff must establish the following elements: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful, overt actions; and (5) damages as a proximate result." *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010) (quoting *Tri v.*

*J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005)). To satisfy the "meeting of the minds" elements, a plaintiff must allege the defendant had the specific intent to agree "to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means." *Id.* at 408 (quoting *Juhl v. Airington*, 936 S.W.2d 640, 644 (Tex. 1996)). Defendants contend the evidence at trial was legally insufficient to support the jury's finding of either unlawful, overt acts taken in furtherance of a common design or a meeting of the minds.

Wickfire offered evidence at trial that Defendants committed overt, unlawful acts by managing phony AdWords accounts in the names of Wickfire's founders and publishing impersonating ads from those accounts. Pl.'s Exs. [#361-3] Ex. 27 (Laura Woodruff's Phony AdWords Account), Ex. 28 (Josh West's Phony AdWords Accounts). Wickfire also offered evidence that Defendants committed click fraud against Wickfire by using devices tied to TriMax's IP addresses. Afternoon of Jan. 30, 2017 Tr. at 19:5–7, 22:14–23:19, 34:14–35:2; Morning of Jan. 31, 2017 Tr. at 30:20–31:16; *see also* Pl.'s Exs. [#361-5] Ex. 121 (Fraudulent Click Log).

There is also evidence in the record to support Wickfire's argument that Defendants coordinated their conduct to engage in a conspiracy against Wickfire. An agreement to engage in a conspiracy "need not be formal." *Kirby v. Cruce*, 688 S.W.2d 161, 164 (Tex. App.—Dallas 1985, writ ref'd n.r.e.). Rather, "the understanding may be a tacit one and it is not essential that each conspirator have knowledge of the details of the conspiracy." *Id.* As noted above, the jury heard evidence that both Woodruff and West, using accounts and IP addresses associated with TriMax and WREI, accessed phony AdWords accounts from which the impersonating ads were published. *See* Laura Woodruff's Phony AdWords Account; Josh West's Phony AdWords Accounts.

Wickfire produced further evidence of an "interlocking relationship of all Defendants [that] enabled their conspiracy." *See* Pl.'s Resp. [#368] at 18. On December 12, 2013, Wickfire sent a cease-and-desist letter to TriMax and Woodruff. Pl.'s Exs. [#361-8] Ex. 136 (Cease and Desist Letter) at 19–23. The jury heard evidence that within hours of receiving the letter, Woodruff transferred TriMax's 935 AdWords account to West's WREI. *See, e.g.*, Pl.'s Exs. [#361-10] Ex. 281 (Excerpt from Change History); Afternoon of Jan. 31, 2017 Tr. at 38:23–39:17. Although Woodruff insisted at trial that she did not transfer or delete TriMax's 935 account, the jury was not required to accept this testimony as true, and it is not the Court's prerogative to question the jury's credibility determinations. *See Logan*, 263 F.3d at 455 (in considering a renewed motion for judgment as a matter of law, courts do not "weigh evidence, judge witness credibility, or challenge the factual conclusions of the jury").

This evidence is sufficient to show a "concert of action" from which the "natural inference arises that the unlawful, overt acts were committed in furtherance of" a conspiracy. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 581 (Tex. 1963); *see also Westergren v. Jennings*, 441 S.W.3d 670, 683–84 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (stating that even when "no one piece of [] evidence (and perhaps not even the totality of it) shows a conspiracy," circumstantial evidence "and the potential inferences arising therefrom [can] provide a sufficient factual basis"). Because the jury had a reasonable basis to support its finding of civil conspiracy, Defendants' renewed motion for judgment as a matter of law on this ground is DENIED.

### iv.    Lanham Act Claim

#### 1.    Jury's Finding of Liability

The sole basis of Defendants' challenge to the jury's finding of liability under Section 43(a) of the Lanham Act is their claim that the words and symbols the impersonating ads used to

designate Wickfire as the source of the ads were insufficiently "distinctive" to satisfy Section 43(a).

Section 43(a) of the Lanham Act creates a cause of action against a person who, in connection with goods or services,

> uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]

15 U.S.C. § 1125(a)(1)(A). Section 43(a) "extends beyond mere trademark protection." *Schlotzsky's, Ltd. v. Sterling Purchasing and Nat. Distribution Co., Inc.*, 520 F.3d 393, 399 (5th Cir. 2008). Thus, a mark is protectable under Section 43(a) as long as it has acquired distinctiveness, which turns on whether the words or symbols used "cause confusion . . . as to . . . origin, sponsorship, or approval" of goods or services. *Nola Spice Designs v. Haydel Enterps.*, 783 F.3d 527, 537 (5th Cir. 2015).

Words or symbols can be distinctive in one of two ways. First, words or symbols are inherently distinctive if their intrinsic nature serves to identify a particular source. *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 210–11 (2000). Alternatively, words or symbols can "acquire[] distinctiveness, even if . . . not inherently distinctive, if [they] ha[ve] developed secondary meaning, which occurs when, in the minds of the public, the primary significance . . . is to identify the source of the product rather than the product itself." *Id.* (quotation and citation omitted).

As to Defendants' claim that there was insufficient evidence to support a finding that Wickfire's unique identifiers—its tracking identifier 606880 and TheCoupon.co—are distinctive, the Court disagrees. The jury heard evidence that in some of the impersonating ads, Wickfire's

tracking identifier was embedding in the ad, while other impersonating ads linked to Wickfire's uniform resource locator (URL) for TheCoupon.co. *Id.* at 40:4–42:7. Both the tracking identifier, which is a distinctive numerical identifier, and TheCoupon.co, which Wickfire owns, serve to identify one source—Wickfire—and therefore comport with Supreme Court precedent holding symbols are distinctive if their intrinsic nature serves to identify a particular source. *See Samara Brothers, Inc.*, 529 U.S. at 210–11.

Even if Wickfire's unique identifiers are not inherently distinctive, both 606880 and TheCoupon.co have acquired secondary meaning. The Court instructed the jury that it could find a word or symbol acquired secondary meaning by considering seven factors. Charge Ct. [#355] at 7. One of the factors the Court explicitly directed the jury to consider was "instances of actual consumer confusion[.]" *Id.* Hall testified that Defendants' use of Wickfire's unique identifiers caused Wickfire's customers to believe Wickfire published the violating ads. Afternoon of Jan. 30, 2017 Tr. at 43:19–44:12; *see also* Merchant Violation Notice. Hall further testified that this belief led dozens of merchants to send violation notices to Wickfire and, in some cases, even terminate their relationship with Wickfire. *See* Afternoon of Jan. 30, 2017 Tr. at 44:4–18; Pl.'s Exs. [#361-4] Ex. 105 (Bloomex Termination Notice) at 592. In light of the foregoing, the Court finds there is legally sufficient evidence in the record to support the jury's finding of liability under Section 43(a) of the Lanham Act.

## 2.    Defendants' Unclean Hands Defense

Defendants argue Wickfire's Lanham Act claim is barred by the equitable defense of unclean hands. This defense applies "when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Petro Franchise Sys., LLC v. All Am. Properties, Inc.*, 607 F. Supp. 2d 781, 799 (W.D. Tex. 2009) (quoting *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001)).

The unclean hands defense is available only where the alleged misconduct is directly related to the merits of the controversy between the parties. *See Mitchell Bros. Film Grp. v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979). In the context of the Lanham Act, "the unclean hands of the plaintiff must relate to the same product that the defendant allegedly falsely advertised." *Healthpoint, Ltd. v. Ethex Corp.*, 273 F. Supp. 2d 817, 848–49, 851 (W.D. Tex. 2001).

In support of their unclean hands defense, Defendants contend Wickfire took the same actions of which it now complains; that is, although Wickfire complains of Defendants' actions in using its tracking identifiers to confuse merchants, Wickfire itself confused merchants into believing ads originated by Wickfire by (1) "post[ing] ads with a link to WebCrawler, even though the WebCrawler mark belonged to someone else," and (2) "us[ing] tracking links virtually identical to TriMax's tracking links." Renewed Mot. J. Matter Law [#364] at 24. Even assuming the evidentiary record supports these allegations, none of the alleged misconduct has any bearing on the subject matter of this controversy. Defendants urge the Court to draw a comparison between exact tracking identifiers Defendants used to identify Wickfire in their impersonating ads, and the "virtually identical" tracking identifiers Wickfire used to identify Defendants in direct ads it posted after the WebCrawler ad depleted the budget of the direct ad in the first place. *See* Renewed Mot. J. Matter Law [#364] at 24. However, as Wickfire points out, using a "virtually identical" tracking identifier is like using a "virtually identical" driver's license number: any difference between the two numbers removes the possibility of confusion. Defendants have therefore failed to convince the Court of Wickfire's unclean hands.

## II.     Motion for New Trial

### A.     Legal Standard

A motion for new trial may be granted if the jury's verdict was against the great weight

of the evidence, the trial was unfair, or some prejudicial error was committed during the trial.

FED. R. CIV. P. 59(a); *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985);

*Conway v. Chem. Leaman Tank Lines, Inc.*, 610 F.2d 360, 363 (5th Cir. 1980). As with a Rule

50(b) motion, the Court views the evidence "in the light most favorable to the jury verdict."

*Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991).

### B.     Application

Defendants raise a number of arguments in their motion for new trial which the Court has

already considered, such as their assertion that the jury's verdict was against the great weight of

evidence. *See* Renewed Mot. J. Matter Law [#364] at 8. The Court rejects these arguments for

the reasons previously stated. *See supra* Section I.B. Defendants also challenge a laundry list of

evidentiary rulings, but do not even attempt to explain the alleged errors or how these errors

prejudiced them. *See id.* at 25. Having carefully considered these evidentiary rulings at trial, the

Court declines to revisit them today.

Defendants do, however, proffer a new substantive argument challenging the jury's

finding that Wickfire had a colorable right to intentionally interfere with TriMax's contracts.

Defendants contend this finding "was wrong, since the record is completely devoid of any such

evidence that would represent Wickfire mistakenly believing that its tortious interference was

somehow legal." *Id.* at 26. However, the jury heard evidence that Google investigated Wickfire's

AdWords bidding and determined it was permissible. Pl.'s Exs. [#361-4] Exs. 55 (First Email

from Google AdWords Team), 56 (Second Email from Google AdWords Team), 57 (Third

Email from Google AdWords Team); Feb. 1, 2017 Tr. at 90:11–92:11. Moreover, Hall testified

Google never complained to Wickfire about its bidding, even though Google had investigated these practices. Afternoon of Jan. 30, 2017 Tr. at 35:24–37:8. Hall further testified that it received awards from Google even after it told Google about its bidding practices. *Id.* at 37:9–38:13. Having heard this evidence, the jury could reasonably conclude Wickfire had a "good-faith belief that it had colorable legal rights to take such actions, even if that belief ultimately proved to be mistaken." Charge Ct. [#355] at 12; *see, e.g.*, *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 727 (Tex. 2001) ("[W]hen two parties are competing for interests to which neither is entitled, then neither can be said to be more justified or privileged in his pursuit. If the conduct of each is lawful, neither should be heard to complain that mere unfairness is actionable.").

III.    **Wickfire's Motion for Entry of Judgment**

In its motion for entry of judgment, Wickfire seeks entry of judgment and requests prejudgment and postjudgment interest on its damage award. *See* Mot. Entry J. [#363]. Defendants oppose this motion, arguing, among other things, the language in the proposed judgment is both inflammatory and misrepresents the jury's verdict and contending Wickfire is not entitled to prejudgment interest on its damage award. In an attempt to address Defendants' objections and expedite the resolution of the case, Wickfire filed a revised proposed judgment. The Court finds the language of the revised judgment accurately represents the jury's verdict and therefore sufficiently addresses Defendants' first challenge to Wickfire's proposed judgment.

Nevertheless, the Court finds merit in Defendants' challenge to Wickfire's request for prejudgment interest, and therefore denies Wickfire's motion for entry of judgment to the extent it seeks prejudgment interest on its damages award. "State law governs the award of prejudgment interest in diversity cases." *Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994) (citations omitted). Because the Court has supplemental jurisdiction over Wickfire's state law claims, Texas law applies to those claims. *See, e.g.*, *Wesley v. Yellow Transp., Inc.*, No. 3:05-CV-2266-D, 2010 WL

3606095, at *1 (N.D. Tex. Sept. 16, 2010) (applying Texas law to the plaintiff's state law claim arising under supplemental jurisdiction to determine the award of prejudgment interest). "In the absence of a statutory right to prejudgment interest, Texas law allows for an award of equitable prejudgment interest under *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex. 1985)." *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1057 (5th Cir. 1996). Under this standard, "an equitable award of prejudgment interest should be granted to a prevailing plaintiff in all but exceptional circumstances." *Id.* (citation omitted). Exceptional circumstances exist where a plaintiff improperly delays resolution of an action, a genuine dispute over a good faith claim exists in a mutual fault setting, an equitable doctrine cautions against the award, or the damages award was substantially less than the amount claimed by the plaintiff. *See Reeland Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir. 1986).

The Court finds this case presents nothing if not exceptional circumstances. As the Court previously stated, "[t]his case is an example of failure to have any diligence in complying with the Federal Rules of Civil Procedure, this Court's orders or the simple prosecution and development of a case." Order of Dec. 23, 2014 [#65] at 1. To highlight just a few instances of particularly exceptional conduct throughout this litigation, the Court directs the parties' attention to Wickfire's repeated motions to extend deadlines and its five attempts to plead an adequate complaint over the course of a year and a half, which is especially striking given Wickfire's present contention that it was ready for trial in October 2015 even though four months before trial, each side had taken but a single deposition, and further, thirty-three third-party subpoenas remained outstanding. *See* Order of June 20, 2015 [#123] at 1.

Defendants, for their part, contributed to the exceptional circumstances by ignoring the Court's admonition that Defendants' Sherman Act allegations "appear completely devoid of factual support and in present form are nothing more than bare legal conclusions," Order of June

20

10, 2015 [#123], and continuing to pursue these claims for months until the Court ultimately dismissed these claims on March 24, 2016. *See* Order of Mar. 24, 2016 [#198]. Defendants' multiple attempts to plead these claims included language so inflammatory the Court granted Wickfire's motion to strike the language, noting that "any first-year lawyer would know" the challenged allegations in the counterclaims "will not be admissible and should never have been pleaded," and *sua sponte* sealing one of Defendants' pleadings. *See* Order of Jan. 5, 2016 [#160]; Am. Countercl. [#151] ¶¶ 20.5, 20.10. Although Defendants share in the blame for delays in this case, it is the "utterly abysmal track record" of *both* parties that contributed to the beleaguered nature of this action. *See* Order of June 15, 2016 [#230] at 1, 8. In light of the exceptional circumstances presented in this case, the Court declines to award Wickfire's prejudgment interest on its damages award.

Wickfire is, however, entitled to recover postjudgment interest on this amount. Postjudgment interest, unlike prejudgment interest, is a matter of federal law and is awarded as a matter of course under 28 U.S.C. § 1961. Such interest is calculated at the time the judgment is entered and is based on the weekly average Treasury yield. 28 U.S.C. § 1961(a). In this case, the Court awards postjudgment interest of 1.00% per annum until the entire amount of the final judgment, including damages, prejudgment interest, and attorneys' fees, is fully paid. *See, e.g.,* *Fuchs v. Lifetime Doors, Inc.*, 939, F.2d 1275, 1280 (5th Cir. 1991) ("[W]e direct the district court to award post-judgment interest on the entire amount of the judgment, including damages, prejudgment interest, and attorney's fees.").

### Conclusion

IT IS ORDERED that Plaintiff Wickfire, LLC's Unopposed Motion to Dismiss [#344] is GRANTED;

21

IT IS FURTHER ORDERED that Plaintiff Wickfire, LLC's claims for business disparagement, defamation, and misappropriation are DISMISSED WITH PREJUDICE;

IT IS FURTHER ORDERED that Defendants TriMax Media, LLC, WREI, Inc., Josh West, and Laura Woodruff's Motion for Judgment as a Matter of Law [#364] is DENIED;

IT IS FURTHER ORDERED that Plaintiff Wickfire, LLC's Motion for Entry of Final Judgment [#363] is GRANTED IN PART and DENIED IN PART as described in this opinion;

IT IS FURTHER ORDERED that Plaintiff Wickfire, LLC does have and recover judgment against Defendants TriMax Media, LLC, WREI, Inc., Josh West, and Laura Woodruff in the amount of TWO MILLION THREE HUNDRED EIGHTEEN THOUSAND AND 0/100 DOLLARS ($2,318,000.00), plus postjudgment interest at the rate of 1.00% per annum from the date of this judgment until the judgment is fully paid;

IT IS FURTHER ORDERED that, pursuant to the jury's proportionate responsibility findings, Defendant Laura Woodruff must pay 95% of the total amount of the judgment and Defendant Josh West must pay 5% of the total amount of the judgment; and

IT IS FINALLY ORDERED that the parties, both having argued they are entitled to reasonable attorneys' fees, shall file respective motions requesting an amount of attorneys' fees through the procedure provided by Local Rule CV-7(j). Counsel for both parties shall meet and confer, either in person or by telephone—not by email—and attempt to agree on a request for attorneys' fees before any such request is filed. Each party's request must be filed within FOURTEEN (14) DAYS of entry of this Order, and

the responding party shall have FOURTEEN (14) DAYS from the date of the filing of the

request to object or otherwise respond to the request.

SIGNED this the 23rd day of March 2017.


SAM SPARKS
UNITED STATES DISTRICT JUDGE